**DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA, et al., Petitioners,**

v.

**The WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

D.C. Transit System, Inc., Intervenor.

**Nos. 21865, 24398, 24415 and 24428.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1993.

Decided Sept. 21, 1993.

Gilbert Hahn, Jr., Washington, DC, was on the request for further fees for Black United Front, et al., petitioners in No. 24428.

Leonard Bebchick, Washington, DC, was on the opposition to the request for further fees for Security Trust Company, N.A. as escrow agent/depositary for the account of the Washington Metropolitan Area Riders' Fund.

Landon G. Dowdey, Washington, DC, for Democratic Central Committee of the District of Columbia, et al., petitioners in Nos. 21865 and 24398.

Harvey M. Spear, New York City, for D.C. Transit System, Inc., intervenor in Nos. 21865, 24398, 24415, and 24428.

Lutz Alexander Prager, Deputy Assistant Corporation Counsel, Washington, DC, for District of Columbia, petitioner in No. 24415.

O. Roy Chalk, pro se.

Before: BUCKLEY and RANDOLPH, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed PER CURIAM.

PER CURIAM.

In two separate cases petitioners attacked the validity of some fare increases collected by D.C. Transit System, Inc. ("Transit") prior to its takeover by Metro. After extensive litigation extending over a number of years, the parties reached a Compromise Agreement (Agreement) that was approved by the Court's order of February 26, 1990. The Agreement provided, *inter alia*, for the eventual payment by Transit of $9.2 million[1] in restitution for the benefit of the Washington Metropolitan Area Riders' Fund ("Riders' Fund"), and for payment to petitioners' attorneys of fees in two installments dependent upon the amount of restitution paid in cash.

### THE PROVISION FOR PETITIONERS' ATTORNEYS' FEES

The Compromise Agreement of January 26, 1990, provided that at its closing set for May 29, 1990 Transit was to deliver to Security Trust Company, N.A. (the "Trust Company"), as the Escrow Agent/Depositary for the Washington Metropolitan Area Riders' Fund, $4.7 million in cash as partial restitution and was to deliver a $4.5 million promissory note payable to the Riders' Fund on July 14, 1992.[2] The $4.5 million note stated that it was secured by first lien deeds of trust on Transit's rights-of-way in Montgomery and Prince George's Counties in Maryland and, based upon such security, and the anticipated timely receipt by the Riders' Fund of $9.2 million in restitution in two installments, the Court approved the Compromise Agreement provisions for payment to petitioners' attorneys of fees as follows:

3.1 *Attorneys' Fees and Expenses.* From the Four Million Seven Hundred Thousand ($4,700,000) Dollars in cash funds delivered to the Escrow Agent at the closing, the principal and interest on the promissory note paid to the Escrow Agent as provided by Section 1.1 and 1.4 hereof, and the proceeds from reinvested funds,

---

1. The report of the Washington Metropolitan Area Transit Commission found that the total amount of restitution due in *DCC-III*, which consolidated the Black United Front and the Democratic Central Committee cases, was $3,106,468 as of June 28, 1973. This represents the fare overcharge that petitioners' attorneys rectified. The interest increment on this amount of restitution from June 28, 1973 through June 16, 1988 was $6,848,551 bringing the total restitution plus interest increment to $9,955,019 through June 16, 1988. When the Commission's expenses in the DCC remands and its expenses are subtracted from the total restitution demand plus interest increment, the result is a net restitution in the *DCC-III* cases of $9,812,633 as of June 16, 1988. *Report of Findings and Recommendations of the Washington Metro. Area Transit Comm'n,* December 9, 1988. It was this sum of $9,812,633 that the parties compromised in agreeing on a payment of $9,200,000.

2. Compromise Agreement, sections 1.1 and 1.2.

the Escrow Agent will pay the following attorneys' fees and expenses:

(a) To Landon G. Dowdey, (1) at the time of closing, $500,000 for attorneys' fees and $20,601.45 for out of pocket costs; and (2) on the date that each interest payment is made on the promissory note, 11.11% of each such interest payment to and including the date of the final interest payment; and (3) $500,000 on the date that the principal and final installment of interest on the promissory note for Four Million Five Hundred Thousand ($4,500,000) Dollars are paid in full; and

(b) To Gilbert Hahn, Jr., (1) at the time of closing, $500,000 for attorneys' fees and $29,810.71 for out of pocket costs; and (2) on the date that each interest payment is made on the promissory note, 11.11% of each such interest payment to and including the date of the final interest payment; and (3) $500,000 on the date that the principal and final installment of interest on the promissory note for Four Million Five Hundred Thousand ($4,500,000) Dollars are paid in full; and

(c) No other attorneys' fees or expenses will be paid or payable to any of the parties hereto out of the funds provided by the Compromise Agreement.

### TRANSIT'S DEFAULTS AND SUBSEQUENT AGREEMENTS

However, Transit defaulted in making the first $4.7 million cash payment and the "closing" of the Compromise Agreement never took place. Thereafter the parties in a Supplemental Agreement concurred upon new terms for payment of the $9.2 million to the Riders' Fund. According to the new terms the due date for the $4.7 million cash payment was extended to September 13, 1990, and, in the event Transit failed to make the $4.7 million payment on that date, the Agreement required Transit to deliver to the Trust Company a promissory note for $4.7 million payable on July 14, 1992, including the same terms as the original $4.5 million note. Transit again defaulted on September 13, 1990 in making the required cash payment and subsequently delivered a promissory note for $4.7 million to the Trust Company.

This $4.7 million note stated that it was secured by a deed of trust on two irregular lots within the District of Columbia. These lots are referred to as the "Georgetown Lots."

### THE NAVY YARD SALE

On August 3, 1990, with the Court's approval, Transit sold its Navy Yard Property to 770 Limited Partnership. Part of the consideration for the sale was evidenced by a $4.5 million promissory note ("Navy Yard note") payable to Transit in quarterly installments of principal and interest over a five-year period. Shortly after this sale it was discovered that additional security was required for the indebtedness represented by the two promissory notes secured by the Georgetown Lots and the Maryland rights-of-way because problems regarding easements, title and access to the properties indicated that the security value attributed to the parcels of land was questionable. To improve the security for the notes, Transit was required to assign the $4.5 million Navy Yard note to the Trust Company for the Riders' Fund as additional security for payment of the $4.5 million and $4.7 million notes.

As installment payments were made on the Navy Yard note they were applied against principal and interest due on Transit's two notes payable to the Riders' Fund. And in order to compensate petitioners' attorneys for Transit's delay in making the principal payments upon which their attorneys' fees were based, the Court approved the provision in the Supplemental Agreement, *supra,* directing the Trust Company to make payments from the Riders' Fund to each petitioners' attorney of 11.11% of each quarterly interest payment made on the Navy Yard note that was applied to interest on the $4.7 million note.

As of March 31, 1993 approximately $295,-392.40 had been paid or credited to petitioners' attorneys from interest payments received on the Navy Yard note. We treat these payments from interest as compensation to petitioners' attorneys for delay suffered in receiving fees as agreed upon due to

Transit's failure to make the required restitutionary payments, not as a credit against the reasonable attorneys' fees to be paid to petitioners' attorneys. Nevertheless, the $295,392.40 does constitute compensation that petitioners' attorneys have received.[3]

### COLLECTION PROCEDURES

At this stage of the matter, the two notes having been assigned to the Trust Company for the benefit of the Riders' Fund, it became apparent that Transit was about to default in the payment of these two notes and that the security petitioners' attorneys had accepted for these notes was of questionable sufficiency. To meet this emergency the Trust Company on July 9, 1992, with the Court's approval, appointed Mr. Leonard N. Bebchick as its counsel to collect the balance due on the two notes. Mr. Bebchick had previously handled a similar case against Transit in an outstanding manner.

### APPLICATION OF PAYMENT ON THE NAVY YARD NOTE TO THE PROMISSORY NOTES

On February 1, 1993 the Trust Company discounted the Navy Yard note which then, due to interim payments, had a discounted face value of $3,804,340.45, and the Trust Company credited that amount as a payment on Transit's $4.5 million note payable to the Riders' Fund. This reduced the unpaid balance on Transit's $4.5 million note to $695,659.55. At that time the application of some of the installment payments made on the Navy Yard note to Transit's $4.7 million promissory note had reduced the unpaid principal balance on that note by $432,409.84 leaving a balance due on that note of $4,267,590.16. Thus, the total amount of restitution due and unpaid on both notes as of February 2, 1993 including accrued interest of $12,875.08 was $4,976,124.79—slightly over half of the original obligation of $9.2 million—the total credits against the total principal debt of $9.2 million being $4,236,750.29.

### COLLECTION DIFFICULTIES

The default by Transit in failing to make the cash payment of $4.7 million due on May 29, 1990 as required by the Compromise Agreement of January 26, 1990, and Transit's later default on July 14, 1992 in not paying the balance due on the two notes at maturity as required by their terms and the Supplemental Agreement, constituted a substantial breach of the Compromise and Supplemental Agreements and a violation of the Court's orders. As a result of these defaults by Transit, while some payments had been credited on the notes, the total sum upon which the payment of the initial attorneys' fees of $1 million was predicated has not been paid and liquidating the property that petitioners' attorneys had accepted as security for the notes, and any other available property or assets of Transit, presents considerable difficulties. Counsel for the Trust Company thus faces the task of searching for assets and resorting to extensive activities in an endeavor to collect a very substantial sum of money from an insolvent debtor and assets of difficult liquidity.

Trust Company counsel is vigorously moving to realize on the security for the notes, and on such other available assets of D.C. Transit as he may find, in order to satisfy the Judgment against Transit of $4,976,124.79 and interest as decreed and entered by this Court on March 30, 1993. *Democratic Cent. Comm. of the District of Columbia, et al. v. Washington Metro. Area Transit Comm'n*, 988 F.2d 1239 (D.C.Cir.1993). However, aside from the proceeds realized from the sale of the Navy Yard note, which was not part of the security that petitioners' attorneys originally accepted for either promissory note, the original security for the two notes has yet to produce any net benefit to the Riders' Fund. Additionally, counsel for the Trust Company is likely to have great difficulty in reaching any of Transit's remaining assets because the Chalks in recent years have extensively encumbered most of Transit's remaining limited assets with deeds of trust.

---

**3.** When the $147,696.20 paid or credited from interest payments to each attorney is added to the total of $500,000 and costs in attorneys' fees paid by recent order of the Court, a total of $647,696.20 will have been received by each attorney.

THE SECURITY FOR THE PROMISSORY NOTES

In reviewing the amount of fees for petitioners' attorneys we must take into account that some of the properties they accepted as "security" for the $9.2 million due on the promissory notes are of questionable ownership and value. Some also have difficult problems of access.

(a) *Security for the $4.7 million promissory note.*

The $4.7 million promissory note states:

This note is secured by a First Deed of Trust to Charles G. Cusic, Jr. and Lisa D. Brown, Trustees, and dated as of May 29, 1990 on Lot 817 in Square 1322 and Lot 822 in Square 1321.

The lots referred to are the "Georgetown Lots." According to a surveyor's map these lots are two non-contiguous parcels in the District of Columbia nearby Georgetown University. One large lot (Lot 822 in Square 1321) transects Fowler's Road and continues westward to Glover–Archbold Parkway, while a very small lot (Lot 817 in Square 1322) is a narrow former right-of-way that abuts on Foxhall Road, and then runs east a very short distance to Glover–Archbold Parkway. Glover–Archbold Park separates the two lots. The access to Lot 822 may be insufficient, questionable or at least difficult to establish.

Because of the questionable access to Georgetown Lot 822 and possible zoning difficulties, and its resulting questionable value, Transit was required to put up additional security for the $4.7 million promissory note. To meet this requirement Transit assigned the Navy Yard note to the Riders' Fund. That note has now been discounted and paid into the Riders' Fund, and the only designated security left for the $4,976,124.79 unpaid balance on the two notes are the Maryland rights-of-way and the Georgetown Lots. In addition the Riders' Fund may levy upon or attach any corporate asset of Transit whose value exceeds any encumbrance that is prior to the Riders' Fund judgment.

(b) *Security for the $4.5 million promissory note.*

The promissory note for $4.5 million states that it is:

Secured by a first Deed of Trust dated May 29, 1990, on The Cabin John Right–of–Way in Montgomery County, Maryland, and a first Deed of Trust dated May 29, 1990, on the Prince George's County Right–of–Way, Prince George's County, Maryland.

The Commitment for Title Insurance of April 6, 1990 on the Montgomery County properties indicated eleven (11) parcels were "rights-of-way"—some indicated for "railway purposes." Eleven additional parcels were owned in fee simple, and the deeds for an additional eleven parcels contained specific limitations, conditions and restrictions. The title insurance commitment also stated it would except some "rights of way ... due to possible abandonment." Some of the properties and rights-of-way given as security appear *not* to be owned in fee simple and several parcels are non-contiguous.

The Commitment for Title Insurance of March 9, 1990 on the Prince George's County rights-of-way and other properties indicated similar exceptions and limitations affecting their value. On June 16, 1993 the Trust Company foreclosed on the properties in Montgomery County that were considered to have some potential value; and on the same date similarly foreclosed on three similar properties in Prince George's County.

ATTORNEYS' FEES IN COMMON FUND CASES

██ The award of attorneys' fees in common fund cases is based on

the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund property itself or directly from the other parties enjoying the benefit.

*Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). Generally courts have justified the award of fees in these

cases under one of two basic rationales. The court may find that the class representative is authorized to contract for the entire class and is therefore authorized to pay the expense of litigation with funds intended to benefit the entire class. *See, e.g., Paris v. Metropolitan Life Ins. Co.,* 94 F.Supp. 792, 794 (S.D.N.Y.1947). The other theory is based on quasi-contract:

> When the representative plaintiff recovers a judgment in which the absent class members will share, it is only equitable that he be reimbursed for his expenses from the judgment, else the represented persons get a windfall.

6 Jeremy C. Moore et al., *Moore's Federal Practice* ¶ 54.78(3) (2d ed. 1993); *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (the common fund exception "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense."). In any event, the common fund doctrine is a well established exception to the so-called American Rule which provides that under normal circumstances parties are responsible for their own costs. *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners,* 456 U.S. 717, 721, 102 S.Ct. 2112, 2114, 72 L.Ed.2d 511 (1982); *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 683–84, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983); *Bebchick v. Washington Metro. Area Transit Comm'n,* 805 F.2d 396, 402 (D.C.Cir. 1986); *Puerto Rico v. Heckler,* 745 F.2d 709, 714 (D.C.Cir.1984).

■ Once it is determined that the attorneys are entitled to be paid from the common fund, it is the duty of the court to determine the appropriate amount. Cases have recognized that jurisdiction over the case also carries with it the equitable jurisdiction to award reasonable attorneys' fees in appropriate circumstances. *Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 523 (1st Cir. 1991). Court approval of attorneys' fees in common fund cases is especially desirable because, when it comes to the question of fees, "the interests of the class members' attorneys may differ from the interests of the class members themselves." 3B Jeremy C. Moore et al., *Moore's Federal Practice* ¶ 23.91 (2d ed. 1993). The First Circuit has recognized that "the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." *Weinberger,* 925 F.2d at 524. Therefore, the court must act to protect the interests of the class members and to insure that the fee awarded is reasonable. See *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265–66 (D.C.Cir.1993).

■ In most fee-shifting cases a court will determine a reasonable fee using the lodestar method, that is, multiplying the reasonable hours expended by a reasonable hourly rate. In common fund cases, however, courts often award fees based on a reasonable percentage of the fund. *See Swedish Hosp. Corp.,* 1 F.3d at 1267 (listing cases). In fact, every Supreme Court case that has addressed the issue has determined reasonable fees payable from a common fund on a percentage of the fund basis. *See, e.g., Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Central R.R. & Banking v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882). In these cases the percentage is to be determined by the court based on reasonableness under the circumstances of a particular case.

In 1985 a Third Circuit task force commissioned to study the problems of court-awarded fees determined that the percentage of the fund method was the best way to achieve the goals in common fund cases of fair and reasonable compensation, predictability, simplification, the discouragement of abuses and fairness to the parties. *Court Awarded Fees,* Report of the Third Circuit Task Force, October 8, 1985, 108 F.R.D. 237, 255 (1985). The percentage of the fund approach helps to align more closely the interests of the attorneys with the interests of the parties. *See Swedish Hosp. Corp.,* 1 F.3d at 1268–69.

### BACKGROUND FOR PETITIONERS' ATTORNEYS FEES

■ Transit's failure to pay approximately $5 million of the amount of restitution upon which the February 26, 1990 order for the payment of $2 million in attorneys' fees was based, and the resulting need for the Trust Company to appoint Mr. Bebchick as counsel in order to collect that amount, renders that Court order inoperative. Thus, since approximately $5 million of the $9.2 million which was to serve as the basis for paying petitioners' attorneys fees remains unpaid, and the services of petitioners' attorneys have terminated with respect to the litigation, it is necessary for the Court to determine reasonable attorneys' fees that should be paid to the petitioners' attorneys for their services. In determining this amount the Court is not bound by its order of February 26, 1990, or the subsequent Supplemental Agreement because those agreements were never closed and because the amount of restitution upon which those fees were to be paid has never been fully realized.

On March 30, 1993 when judgment was entered against Transit for $4,963,249.71, and $12,875.08 in interest, $4,236,750.29 represented the total principal payments in restitution that had been made on the promissory notes for $9.2 million. If the principal payments had been applied in their entirety to the note for $4.7 million, a balance of $463,249.71 would still be unpaid. Thus, even if the Agreement of January 26, 1990 had closed, petitioners' attorneys would still not be entitled to their initial fees of $500,000.

### APPLICATION OF CREDIT FOR FORECLOSED PROPERTIES

In addition to the sums that have been credited against the $9.2 million principal amount due on the notes by virtue of restitutionary payments received on the Navy Yard

4. The $4,514,720.30 figure represents $3,804,340.45 Navy Yard Note proceeds, $432,409.84 principal payments, and $277,970.01 foreclosure sales. If any additional foreclosure costs attributed to the Maryland rights-of-way are determined and assessed against Transit, the foreclosure figure will decrease; similarly, if any additional properties are acquired by foreclosure, the figure will increase.

note, we credit an additional $277,970.01. On January 19, 1993 long after the petitioners' active participation in the cases had terminated, the Trust Company, on behalf of the Riders' Fund, bid $300,000 of Transit's indebtedness in acquiring the Georgetown Lots at a foreclosure sale. These lots had served as the original security for Transit's $4.7 million promissory note. Following the deduction of costs, $254,510.76 was credited to Transit. Subsequently the Trust Company foreclosed on the Maryland rights-of-way bidding $42,500 to acquire such properties. These rights-of-way had served as original security for the $4.5 million note. Foreclosure costs have totalled $19,040.75, and Transit was credited with the remaining $23,459.25. Thus, as a result of these foreclosures, Transit is entitled to an additional credit of $277,970.01. When this $277,970.01 is credited against Transit's $9.2 million restitution requirement Transit is entitled to a total credit of $4,514,720.30—approximately 49.1% on the total sum due.

The sum of $4,514,720.30 also represents 96.1% of the payments of principal required by the $4.7 million note—the amount of restitution required by the February 26, 1990 order to be paid to qualify for the first attorneys' fees payment of $500,000 to each counsel if the Compromise Agreement had closed and become effective.

### COMPUTATION OF ATTORNEYS' FEES

■ Under the Court's order of June 22, 1993 the Trust Company paid fees and expenses out of the Riders' Fund to petitioners' attorneys totalling $1,050,412.16. The payment of $500,000.00 and costs to each attorney constituted 23.3% of $4,514,720.30 which represents the sum total of all principal payments made by Transit as restitution.[4]

Petitioners' attorneys had also been paid a total of $295,392.40 from payments of interest received on the promissory notes. That petitioners' attorneys have received this sum out of interest payments made on the promissory notes precludes using the total interest payments received to bolster the total principal payments of restitution.

This figure is roughly comparable to the 25% paid to Mr. Bebchick in his line of cases after an enhancement based on the quality of his representation—*Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 405 (D.C.Cir.1986)—and the full amount of restitution had been paid (*see Bebchick Response to Request for Further Fees,* January 26, 1993) and it falls well within the range usually awarded in common fund cases. *Swedish Hosp. Corp.,* 1 F.3d at 1272 ("[A] review of similar cases reveals that a majority of common fund class action fee awards fall between twenty and thirty percent."); *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ("The majority of common fund fee awards fall between 20% and 30% of the fund.").

The figure is also roughly comparable to the percentage that the attorneys would have been entitled to had the Compromise and Supplemental Agreements become effective. As mentioned above, the original agreements called for attorneys' fees and expense payments of $1,050,412.16 (22.3%) when the note for $4.7 million was fully paid in cash. Thus, the Court order of June 22, 1993 actually awarded petitioners' attorneys an amount that slightly exceeds the amount they would have been entitled to under the Compromise and Supplemental Agreements. In fact, it could be argued that under the strict terms of these agreements the petitioners' attorneys would not be entitled to any fees until the $4.7 million note was paid in full. However, under the circumstances of this case we do not consider it equitable to enforce such strict construction. The Court considers this award of fees to be reasonable and equitable considering the interests of both the attorneys and the class of beneficiaries. *See, e.g., Florida v. Dunne,* 915 F.2d 542, 545 (9th Cir.1990) ("[W]e require only that fee awards in common fund cases be reasonable under the circumstances.").

At this point, the benefits provided to the class by petitioners' attorneys have been all but exhausted. Although they did secure the two promissory notes as evidence of Transit's indebtedness to the Riders' Fund, it appears that these notes were woefully under-secured. Practically all of the property that petitioners' attorneys finally accepted as security for these notes has been sold either outright or at a foreclosure sale, and the Riders' Fund is still approximately $5 million short of the total amount of restitution that is due in conformance with the agreements of the parties.

We conclude in view of all the files and records in these cases, all motions of the parties, and for all the reasons set forth above that $500,000 and costs to each attorney is an appropriate fee for their entire services in these cases. *See Swedish Hosp. Corp.,* 1 F.3d at 1272 ("We hold that the court was within its discretion in basing its fee calculation only on that part of the fund for which counsel was responsible."). This amount awarded by the Court's order of June 22, 1993 is roughly equivalent to the percentage agreed to by the parties in the Compromise and Supplemental Agreements and falls within the range normally awarded in common fund cases. In these circumstances we are of opinion that the payment to each attorney of $500,000.00 and costs is reasonable and justifiable.

### REQUEST FOR $600,000 FURTHER FEES

Both petitioners' attorneys also seek an "additional" $300,000 fee ($600,000 total) because they were allegedly relieved "without cause" from their participation in the case. Apart from any discussion of the "cause," petitioners' attorneys *were not relieved, their services simply came to an end.* When the very difficult problem of collecting the unpaid sums due on the notes held by the Trust Company became the duty of the Trust Company in carrying out its obligation to the Riders' Fund as Escrow Agent, the Trust Company was clearly entitled, with court approval, to select Mr. Bebchick as its own counsel to collect on the defaulted notes. There was never any assurance that the Trust Company would employ petitioners' attorneys to collect on the promissory notes after the notes were not paid at maturity and thus became an obligation of the Riders' Fund to collect.

Petitioners' attorneys' request is also based upon the "anticipated receipt in cash on or about January 30, 1993 of funds from

the Navy Yard note," and upon the contention that the fee request was supported by an alleged "Bebchick Principle," i.e., fees paid to Mr. Bebchick in an earlier D.C. Transit invalid fares case. *Bebchick v. Washington Metro. Area Transit Comm'n,* 805 F.2d 396, 400 (D.C.Cir.1986). However, as heretofore noted, the payments received on the Navy Yard note have already been taken into consideration by the Court.

In addition, petitioners' attorneys cannot rely upon any so-called "Bebchick Principle" in this case. In *Bebchick* the full attorney's fee was not paid until the amount of restitution had been paid in full, *supra* at pp. 1574–75, and the Court awarded an upward enhancement to his fee because of the "unusually good representation" Mr. Bebchick provided, 805 F.2d at 407, and because he "exhibited an unusually high level of skill which is not reflected in the hourly charge utilized to compute the lodestar." 805 F.2d at 408. Such justifications do not exist here.

CONCLUSION

The Court, accordingly, by its recent order of June 22, 1993 authorized and directed the Trust Company to pay petitioners' attorneys a total of $1 million from the Riders' Fund; i.e., $500,000 to each attorney, and their out of pocket expenses.[5]

The request of January 19, 1993 by petitioners' attorneys for "Further Fees" of $600,000 ($300,000 each) and "(b) 11.11% [?] interest on [an alleged] ... $200,000 balance due each counsel to accrue at a rate equal to the yield realized by the funds deposited in the bank; and (c) 11.11% of any interest payment made into the [Riders' F]und" are each denied in their entirety. Petitioners' attorneys have been paid in full for their

---

5. If petitioners' attorneys have any additional reimbursable costs, they may submit an appro-

services and no further services are due, nor are any sums accruing.

*Judgment Accordingly.*