DEMOCRATIC CENTRAL COMMITTEE
OF the DISTRICT OF COLUMBIA,
et al., Petitioners,

v.

The WASHINGTON METROPOLITAN
AREA TRANSIT COMMISSION,
Respondent.

D.C. Transit System, Inc., Intervenor.

Nos. 21865, 24398, 24415 and 24428.

United States Court of Appeals,
District of Columbia Circuit.

Nov. 4, 1994.

**604**

Gilbert Hahn, Jr., Washington, DC, for Black United Front, et al., petitioners in No. 24428.

Landon G. Dowdey, Washington, DC, for Democratic Central Committee of the Dis-

trict of Columbia, et al., petitioners in Nos. 21865 and 24398.

Before: BUCKLEY and RANDOLPH, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed PER CURIAM.

## ON PETITION FOR REHEARING

### PER CURIAM:

Petitioners' attorneys request rehearing and clarification of the opinion entered in *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 12 F.3d 269 (D.C.Cir.1994). Their contention is that this Court violated the Takings Clause of the Fifth Amendment of the U.S. Constitution by refusing to abide by provisions for attorneys' fees contained within a compromise agreement[1] tentatively approved by a court order before the case was finished. However, this being a common fund case, the attorneys' fees provisions never came within the competency of the parties to the action to establish, and the court's approval of those provisions was premature and conditional upon restitutionary payment being made according to the terms of the compromise agreement. Moreover, the subsequent defaults of D.C. Transit System, Inc. ("Transit") to make the restitutionary payments upon which the fees were based rendered the fee provisions inoperative. In addition, when the original attorneys' services with respect to the Riders' Fund case came to a conclusion, less than fifty percent (50%) of the restitutionary damages had been paid and the NationsBank Trust Company ("Trust Company") (formerly the Security Trust Company), the Escrow Agent/Depositary for the Riders' Fund, with the court's approval, appointed Mr. Leonard N. Bebchick to undertake the task of collecting the remainder of the restitutionary damages.

---

1. The original compromise agreement was signed by the parties on January 26, 1990 and approved by court order on February 26, 1990. The original agreement was supplemented by court orders entered on July 2, 1990, and Sep-

tember 11, 1990. Throughout this opinion, the term "compromise agreement" will refer to the agreement as amended by the supplemental orders unless otherwise indicated.

Because this court under its equitable powers necessarily retained the power to amend the fee provisions as changed circumstances required, we find that the attorneys do not have a "private property" interest, much less a "vested interest" in the future payment of fees from the Riders' Fund cognizable under the Takings Clause of the Fifth Amendment. Therefore, the petition for rehearing and clarification is denied.

The facts involved in this petition for rehearing are set out in the court's prior opinions in this case at 12 F.3d 269 (D.C.Cir.1994) and at 3 F.3d 1568 (D.C.Cir.1993). Basically, petitioners' attorneys claim that this court has violated the Takings Clause of the Fifth Amendment by refusing to abide by the attorneys' fees provisions contained in a compromise agreement signed by the parties and prematurely approved by a tentative court order. Their contention is that the Court has taken their private property in violation of the Takings Clause of the Fifth Amendment by refusing to provide for any further award of fees if the Trust Company obtains a further substantial recovery for the Riders' Fund. To date, the Court, through its opinion of September 21, 1993, *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 3 F.3d 1568 (D.C.Cir.1993), has awarded each of petitioners' attorneys $500,-000 in attorneys' fees. Each attorney has also received an additional $147,696.20 from payments of interest on the promissory notes. In addition, counsel for the Democratic Central Committee has been reimbursed $20,601.45 for his out of pocket expenses, while counsel for the Black United Front has been reimbursed $36,376.73. Thus, payments from the Riders' Fund to Mr. Dowdey and Mr. Hahn come to $668,-297.65 and $684,072.93, respectively—a total of $1,352,370.58 in fees and expenses.

■ At this point it is appropriate to identify exactly what property interest petitioners' attorneys contend is involved in the Court's alleged taking. It is not the right to the assets of the Riders' Fund itself. For the purposes of this opinion, we assume that the actual monies in the Riders' Fund are private property within the meaning of the Takings Clause. The property interest that

petitioners' attorneys are concerned with is their interest in being paid fees from the Riders' Fund. And as discussed *infra,* this interest is one that must be created by the Court because the parties themselves lack the power to assess fees against the common fund.

■ Any interest that petitioners' attorneys may have had in receiving fees from the Riders' Fund must have been created by the Court. In common fund cases, it is not the creation of the fund itself that entitles the attorneys to be paid from the fund. Rather, any obligation that the fund incurs to pay attorneys' fees must result from the exercise of the court's inherent equitable power to assess fees against those who stand to ultimately benefit from the fund. *See Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 3 F.3d 1568, 1572–73 (D.C.Cir.1993). As the Federal Circuit has recently stated:

> Recovery under the common fund doctrine stems from the equitable power of a court to create the obligation for attorney fees against benefits some received as a result of the advocacy of another. The obligation of the party holding the common fund to pay the attorneys flows from the *court order* not from the common fund *theory.* The common fund doctrine may provide the justification for a court order but, in and of itself, the doctrine imposes no obligation or liability on the common fund or on the party holding that fund.

*Knight v. United States,* 982 F.2d 1573, 1580–81 (Fed.Cir.1993) (emphasis in original). The parties to the litigation simply do not have the power to assess attorneys' fees against the fund. Therefore, although the attorneys' fees provisions appear in an agreement signed by the litigating parties, any interest that petitioners' attorneys may have had in receiving fees from the Riders' Fund must have been created by the Court when it tentatively approved the compromise agreement.

■ Because attorneys must rely upon the court's power to assess fees against a common fund, any property interest that the attorneys may have in being paid from the common fund is necessarily limited by the

court's exercise of that power. In this case, when the Court approved the compromise agreement, including its attorneys' fees provisions, the Court did not intend to create a present property interest in favor of petitioners' attorneys. The Court's premature approval of payment to these attorneys was contingent upon payment of restitution to the Riders' Fund according to the terms of the compromise agreement. Petitioners' attorneys must have been aware that the Court intended to retain the power to alter or disregard the attorneys' fees provisions of the compromise agreement in the event that the circumstances changed such that an award of fees pursuant to these provisions was no longer reasonable. Following the defaults by D.C. Transit, as the parties negotiated and submitted proposed agreements to the Court, the Court consistently insisted that the attorneys' fees provisions should allow for payment of these fees only as a reasonable proportion of the amount actually collected by the Riders' Fund for which petitioners' attorneys were responsible. The Court also insisted that payment of these fees should not take place until funds were actually received by the Riders' Fund. It was clear that the Court intended the collection of the restitutionary amounts to be a condition precedent to the payment of attorneys' fees.

■ In addition, it was clear from the court order approving the compromise agreement that the Court intended to retain supervision of the agreement. The February 26, 1990 order approving the agreement states that "this Court shall maintain supervision of the Compromise Agreement," Order Approving Settlement and Establishing Riders' Fund, Feb. 26, 1990, at 3, and further states that "the Court retains jurisdiction of all matters in all subject cases until further order of the Court, and specifically retains jurisdiction to resolve any and all disputes arising under or relating to this settlement and with respect to all subject litigations." *Id.* at 4. The Court's actions throughout the negotiation, approval, and implementation of the compromise agreement have been consistent with its original intent to award fees from the Riders' Fund based only on a reasonable proportion of the amount attributable to the efforts of petitioners' attorneys and payable only as the Riders' Fund actually received payment.

■ Generally, when a government entity acts to create property rights yet retains the power to alter those rights, the property right is not considered "private property," and the exercise of the retained power is not considered a "taking" for Fifth Amendment purposes. *Cf. Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986) ("The provision simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation."); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d 1272, 1277 (4th Cir.1990), *cert. denied*, 498 U.S. 895, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990) ("The reservation of the power to amend the terms of the [Guaranteed Student Loan] program prevents the participating state agencies from invoking the Fifth Amendment Takings bar against subsequent Congressional action."). Although the cases cited above address rights created by Congress rather than by a court, the rationale for finding no cognizable "private property" interest is the same. The notion of "private property" is concerned with the ability to control particular property. As the *South Carolina State Education Assistance Authority* Court stated, "[t]he essential aspects of private property are free use, enjoyment and disposal and the right to exclude others." 897 F.2d at 1276 (quoting *Buchanan v. Warley*, 245 U.S. 60, 74, 38 S.Ct. 16, 18, 62 L.Ed. 149 (1917) and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011, 104 S.Ct. 2862, 2877, 81 L.Ed.2d 815 (1984)) (internal quotation marks omitted). The intent to reserve the power to alter a government created right in response to changing conditions indicates an unwillingness by the government entity to relinquish control of the property to such an extent that it acquires the status of "private property." *See id.*

■ Also, although the reservation of the power to amend may be necessary to prevent a government created property right from achieving the status of "private property" for Fifth Amendment purposes, such reservation need not be express, but may be implied based on the prior actions of the government authority that created the right. *See Great Lakes Higher Educ. Corp. v. Cavazos,* 911 F.2d 10, 16 (7th Cir.1990); *Education Assistance Corp. v. Cavazos,* 902 F.2d 617, 629 (8th Cir.1990); *Ohio Student Loan Comm'n v. Cavazos,* 900 F.2d 894, 901–02 (6th Cir. 1990); *South Carolina State Educ. Assistance Auth. v. Cavazos,* 897 F.2d 1272, 1276 (4th Cir.1990).

The Court's insistence that the compromise agreement provide for the payment of attorneys' fees only as a reasonable proportion of the amount actually recovered and only as monies actually came into the Riders' Fund was one indication that the Court intended to reserve the power to alter the attorneys' fees provisions as circumstances warranted.

In addition, on a prior occasion the Court has exercised the retained power to alter the attorneys' fees provisions of the compromise agreement to benefit the petitioners' attorneys without objection by any of the parties or their attorneys. When Transit failed to make the cash payment due at the original closing, the Court issued a supplemental order requiring Transit to issue an additional promissory note to the Riders' Fund. Because part of the attorneys' fees were to be paid from the cash due at the closing, the Court considered it equitable to award petitioners' attorneys a percentage of the interest payments made on this note to compensate them for the delay in the payment of their fees. The supplemental court order approving this arrangement so provided, despite the following language in the original compromise agreement:

> No other attorneys' fees or expenses will be paid or payable to any of the parties hereto out of the funds provided by the Compromise Agreement.

Further Amended Agreement of Compromise and Settlement, January 26, 1990, ¶ 3.1(c). This supplemental court order, in accordance with our equitable powers to assess reasonable fees against the common fund, amended the original agreement to pay each of petitioners' attorneys approximately $150,000 in interest as compensation for the delay they suffered in receiving the initial fees that would have been due and paid had the terms of the original compromise agreement been complied with. If the Court had not intended to retain the power to alter the attorneys' fees provisions as the circumstances warranted, the Court would not have issued this supplemental order, and the order itself would have been *ultra vires.*

Even if the interests of petitioners' attorneys could be considered "private property" within the meaning of the Fifth Amendment, these interests were not lost as a result of the Court's action. None of the conditions called for by the compromise agreement for the payment of attorneys' fees has ever taken place. The first of these conditions was the payment of $4.7 million in cash that was originally due at the closing of the compromise agreement scheduled for May 29, 1990. Not only did the payment not take place, but the promissory note that was substituted for this $4.7 million payment has never been paid in full. The same is true of the $4.5 million promissory note. The total sum paid was $4.3 million that would not have paid the $4.5 million promissory note even if it had been applied to that note. The compromise agreement provided that petitioners' attorneys were not to be paid any fees from the Riders' Fund until at least one of these obligations was paid in full. Both promissory notes have been cancelled and merged in the judgment entered by this Court on March 30, 1993, in favor of the Riders' Fund. Because the property pledged and accepted as security for the promissory notes was inadequate, this judgment was necessary to allow counsel for the Trust Company to proceed against other available assets of Transit, such as real property and the lease payments that Transit receives from the Brookland Garage. When the promissory notes were cancelled and merged into this judgment, the conditions upon which petitioners' attorneys were to be paid fees from the Riders' Fund could no longer occur.

■ Therefore, when the Court did award fees to petitioners' attorneys it did so on an equitable basis rather than according to the terms of the compromise agreement. As the Court's original opinion on attorneys' fees stated, "we do not consider it equitable to enforce such strict construction [of the compromise agreement]." *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 3 F.3d at 1575. Instead, the Court took great pains to account for any benefit that the services of petitioners' attorneys may have conferred on the Riders' Fund and awarded these attorneys a reasonable percentage of the funds produced through their efforts. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C.Cir.1993) (holding that it is within the discretion of a court awarding fees from a common fund to base its award "only on that part of the fund for which counsel was responsible."). Although petitioners' attorneys may understandably be disappointed that they have not earned and received the fees they expected following their length of service, any further interests that they may have had in receiving additional fees from the Riders' Fund were not lost due to the Court's actions. These interests were lost due to the nature of common fund attorneys' fees awards and because the conditions precedent to their vesting did not occur.

Moreover, when the Court approved the Trust Company's appointment of counsel to represent the interests of the Riders' Fund, slightly less than half of the $9.2 million in restitutionary payments provided for by the compromise agreement had been collected and the court had paid half the attorneys' fees called for by the compromise agreement if that agreement had been in effect. Because petitioners' attorneys had never been appointed class counsel, the Trust Company's appointment of counsel to collect the remainder of the restitutionary funds effectively terminated the services of these attorneys with respect to the Riders' Fund.

## CONCLUSION

■ Because the Court reserved the power to amend the attorneys' fees provisions of the compromise agreement as circumstances warranted, the interests that the petitioners' attorneys may have had in being paid additional fees from the Riders' Fund never achieved the status of "private property" for Fifth Amendment Takings Clause purposes. Therefore, the Court's refusal to provide for the payment of additional fees to petitioners' attorneys in the event of a further substantial recovery by the Trust Company for the Riders' Fund did not violate the Takings Clause.

Accordingly, the petition for rehearing and clarification of the opinion entered in *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 12 F.3d 269 (D.C.Cir.1994) is hereby denied.

*So ordered.*