DEMOCRATIC STATE COMMITTEE OF the DISTRICT OF COLUMBIA, et al., Appellants,

v.

Leonard N. BEBCHICK, Appellee.

No. 95–CV–944.

District of Columbia Court of Appeals.

Argued May 29, 1997.

Decided Jan. 15, 1998.

Ronald R. Benjamin, with whom Marya C. Young, Binghamton, NY, was on the brief, for appellants.

Aaron L. Handleman, with whom Laura Gaughan Hale, Washington, DC, was on the brief, for appellee.

Before STEADMAN, FARRELL * and RUIZ, Associate Judges.

* Former Associate Judge Ferren was a member of the division that heard oral argument in this

STEADMAN, Associate Judge:

For years appellants Landon Dowdey and Gilbert Hahn Jr. have attempted to persuade the United States Court of Appeals for the District of Columbia Circuit ("the D.C. Circuit") to award them additional attorneys fees for their efforts in connection with decades of litigation involving D.C. Transit.[1] Thwarted in those efforts, appellants have now brought suit against appellee, Leonard Bebchick, a rival and competing attorney, for the tort of intentional interference with prospective economic advantage. The trial court dismissed the case for failure to state a claim. We affirm.

**I.**

This case is a spin-off of two sets of parallel litigation that began in the D.C. Circuit almost three decades ago. The published decisions in those cases present the following background. Both sets of litigation concerned efforts by D.C. Transit to raise bus fares in the 1960s and 1970s. Appellee Leonard Bebchick was both counsel and a named plaintiff in one lawsuit that attempted to recover bus fares that exceeded D.C. Transit's legal authority. *See Bebchick v. Washington Metropolitan Area Transit Comm'n ("WMATC"),* 256 U.S.App. D.C. 296, 805 F.2d 396 (1986); *Bebchick v. WMATC,* 158 U.S.App. D.C. 79, 485 F.2d 858 (1973); *Williams v. WMATC,* 134 U.S.App. D.C. 342, 415 F.2d 922 (1968). Appellants Landon Dowdey and Gilbert Hahn, Jr. were counsel in a similar lawsuit where Hahn represented appellant Black United Front and Dowdey represented the Democratic Central Committee of the District of Columbia ("DCC").[2] *See, e.g., DCC v. WMATC,* 268 U.S.App. D.C. 406, 842 F.2d 402 (1988); *DCC v. WMATC,* 158 U.S.App. D.C. 107, 485 F.2d 886 (1973); *DCC v. WMATC,* 158 U.S.App. D.C. 7, 485 F.2d 786 (1973). In 1974 the

*Bebchick* litigation resulted in an award of $1.4 million to a trust fund ("the Bebchick Fund") administered by the D.C. Circuit. *See DCC v. WMATC,* 318 U.S.App. D.C. 11, 14, 84 F.3d 451, 454 (1996) (per curiam). In 1990 the *DCC* litigation handled by Dowdy and Hahn resulted in a settlement where D.C. Transit agreed to pay $9.2 million into a common fund ("the Riders' Fund") administered by Security Trust Company ("the trust company").[3] *See DCC v. WMATC,* 303 U.S.App. D.C. 284, 285, 3 F.3d 1568, 1569 (1993) (per curiam).

The terms of the Riders' Fund settlement agreement required D.C. Transit to pay $4.7 million in cash on May 29, 1990, and execute a promissory note for $4.5 million payable to the Riders' Fund on July 14, 1992. *Id.* Under the terms of the settlement Dowdey and Hahn would each receive a fee of $1 million—$500,000 when the cash payment was made and $500,000 more when the promissory note was paid, and the D.C. Circuit would retain supervisory jurisdiction. *Id.* at 285–86, 3 F.3d at 1569–70. D.C. Transit failed to make the cash payment on May 29, 1990, and instead executed a second promissory note for $4.7 million which was also payable on July 14, 1992. *Id.* at 286, 3 F.3d at 1570.

Appellants' amended complaint alleges that as the July 14, 1992 payment date approached it became apparent to the trust company that D.C. Transit would default on both notes, and the trust company approached Dowdey and Hahn about representing the trust company in efforts to collect on the notes. On July 6, 1992 trust company Vice President Frederick W. Clark wrote the late Judge George MacKinnon, then the senior judge on the D.C. Circuit panel with continuing jurisdiction over the case, requesting that the court approve the trust company's retention of Dowdey and Hahn for

---

case. After his departure from the court, Associate Judge Farrell was selected by lot to replace him.

1. D.C. Transit at that time operated buses in the District of Columbia.

2. The named appellant in this case, Democratic State Committee of the District of Columbia, is the successor in interest to the DCC.

3. Security Trust Company was succeeded in interest by NationsBank Trust Company in 1994. *See DCC v. WMATC,* 309 U.S.App. D.C. 28, 29, 38 F.3d 603, 604 (1994) (per curiam). For the sake of clarity, we will refer to both as "the trust company" throughout this opinion.

the purpose of collecting on the promissory notes.

The amended complaint alleges that this letter arrived at Judge MacKinnon's office on July 7 or July 8, and on the latter date, Judge MacKinnon telephoned Bebchick and the two engaged in what the complaint asserts was "an ex parte communication . . . the purpose of which was to interfere with the selection of Dowdey and Hahn by the Trust Company . . . to act as its counsel with respect to the collection efforts." Later that day Bebchick wrote Judge MacKinnon indicating his willingness to act as counsel and stating his fee schedule. According to the amended complaint, this was "an ex parte letter . . . to obtain the appointment for himself." The amended complaint further alleges that Bebchick "act[ed] in concert with Judge MacKinnon and, upon information and belief, other members of the D.C. Circuit panel when, with the knowledge that the escrow agent had not in fact employed or appointed defendant Bebchick as its counsel, the Court entered an Order on July 9, 1992, only three days after Mr. Clark's letter of July 6, 1992, to the effect that it was:

> ORDERED, that the appointment by the Trust Company of Leonard N. Bebchick, Esq., of the Bar of the District of Columbia, 888 Sixteenth Street, N.W., Suite 600, Washington, D.C. 20006, to represent the interests of the Riders' Fund as counsel at an hourly charge of $250.00 is hereby authorized and approved."

The complaint further alleges that the D.C. Circuit mischaracterized this course of events in its opinion of September 21, 1993, where it indicated that

> plaintiffs Dowdey and Hahn *'were not relieved'* by that Court's July 9, 1992, order, *'their services simply came to an end'* (emphasis in original), on the grounds that 'the Trust Company was clearly entitled, with court approval, to select Mr. Bebchick as its own counsel to collect on the defaulted notes,' and further that:

> There was never any assurance that the Trust Company would employ petitioners'

attorneys to collect on the promissory notes after the notes were not paid at maturity and thus became an obligation of the Riders' Fund to collect.

> *See* [303 U.S.App. D.C. at 291,] 3 F.3d at 1575, thus ignoring and misrepresenting Mr. Clark's July 6, 1992 letter.

The amended complaint also alleges that "[f]rom July 8, 1992, through the present, defendant Bebchick has continued to rely on Judge MacKinnon's and the panel's interference with plaintiffs' aforesaid relationships and expectancies, knowing that the same was procured ex parte and without disclosure to the plaintiffs as parties and their counsel of the ex parte communication and the contents thereof."

On July 14, 1992, D.C. Transit defaulted on both notes. 303 U.S.App. D.C. at 287, 3 F.3d at 1571. Collection efforts undertaken by Bebchick eventually resulted in the recovery of about one-half of the total $9.2 million due. *Id.* As a result, the D.C. Circuit awarded Dowdey and Hahn $500,000 each in attorneys fees and denied their requests for additional fees. *Id.* at 290–92, 3 F.3d at 1574–76.[4] Following this award, Dowdey and Hahn sought reconsideration without success. *See DCC v. WMATC*, 304 U.S.App.D.C. 243, 244–45, 12 F.3d 269, 270–71 (1994) (per curiam). Dowdy and Hahn also claimed that the denial of additional fees constituted a taking of property without just compensation in violation of the Takings Clause of the Fifth Amendment. *DCC v. WMATC*, 309 U.S.App. D.C. 28, 29, 38 F.3d 603, 604 (1994) (per curiam). The D.C. Circuit rejected this argument holding that "the attorneys do not have a 'private property' interest, much less a 'vested interest' in the future payment of fees from the Riders' Fund cognizable under the Takings Clause of the Fifth Amendment." *Id.* at 30, 38 F.3d at 605. Specifically the court held that

> [a]ny interest that petitioners' attorneys may have had in receiving fees from the Riders' Fund must have been created by the Court. In common fund cases, it is not the creation of the fund itself that entitles

---

4. At several points in the opinion the court made special note that "the security petitioners' attorneys had accepted for these notes was of questionable sufficiency," 303 U.S.App. D.C. at 287, 3 F.3d at 1571, and that "these notes were woefully under-secured," *id.* at 291, 3 F.3d at 1575.

the attorneys to be paid from the fund. Rather, any obligation that the fund incurs to pay attorneys' fees must result from the exercise of the court's inherent equitable power to assess fees against those who stand to ultimately benefit from the fund.... The parties to the litigation simply do not have the power to assess attorneys' fees against the fund.... Because attorneys must rely upon the court's power to assess fees against a common fund, any property interest that the attorneys may have in being paid from the common fund is necessarily limited by the court's exercise of that power.

*Id.* at 30–31, 38 F.3d at 605–06.

Following this decision in March 1995, Dowdey, Hahn and the other appellants filed suit against Bebchick in Superior Court. The amended complaint principally alleged that Bebchick committed the tort of interference with prospective economic advantage against Dowdey and Hahn by obtaining the appointment to represent the trust company,[5] and contained the allegations of wrongdoing quoted above.

Bebchick moved to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment.[6] The trial court granted the motion to dismiss for failure to state a claim pursuant to Super. Ct. Civ. R. 12(b)(6). The court explained in its oral ruling that

> [i]n short, in the [c]ourt's view, what is involved here is clear. Counsel who were

involved in a very lucrative matter for some period of time were ultimately replaced by the [c]ourt, by the D.C. Circuit, who selected someone else.

The D.C. Circuit['s] reasons for that may have been sound or unsound, wise or unwise; but that certainly is not sufficient to sustain a tort action against defendant Bebchick. None of the allegations in the original complaint or the amended complaint are sufficient to state a cause of action for intentional interference with economic relations or [any] other tort.

There's much complaining and whining about what the D.C. Circuit did in this respect; but, there is virtually nothing by way of any specific allegations of improper conduct or fraudulent or tortious conduct on the part of Mr. Bebchick.

Again as I say beyond these matters, it would appear that the whole subject matter of this complaint is within the exclusive jurisdiction of the D.C. Circuit and not of this [c]ourt. Because of the series of rulings that have been made and the [c]ourt has repeatedly indicated in various documents that it is retaining jurisdiction, I think this is an improper [end]-run around the jurisdiction of those [c]ourts, both the District Court and the D.C. Circuit to deal with this issue.

. . . .

One wants to sue the D.C. Circuit and if you—if that can legally be done, go ahead. But, as to Mr. Bebchick, the allegations of

---

**5.** Additionally, the complaint alleged that Bebchick breached his fiduciary duty by delaying distribution of the Riders' Fund to its beneficiaries. In May 1996 the D.C. Circuit consolidated the Bebchick and Riders' Funds, which then together totaled over $10.5 million, and distributed them to the Washington Metropolitan Area Transit Authority (WMATA) thereby terminating the *Bebchick* and *DCC* litigation. *See* 318 U.S.App. D.C. at 16–19, 84 F.3d at 456–59. We think that the allegation that Bebchick delayed distribution of the fund has been made moot insofar as appellants are concerned by the subsequent distribution of the Riders' Fund to WMATA.

The complaint also alleges that Bebchick "interfer[ed] with the prosecution of plaintiff's claims," "procur[ed] the dismissal thereof," and over-billed the Rider's Fund. Because these claims are not addressed in the brief on appeal

we consider them abandoned. *See District of Columbia v. Patterson,* 667 A.2d 1338, 1346 n. 18 (D.C.1995) ("All arguments for reversal must appear in the opening brief, so that the appellee may address them."), *cert. denied,* —— U.S. ——, 117 S.Ct. 688, 136 L.Ed.2d 612 (1997). Moreover, all of these complaints arising from Bebchick's representation of the fund should have been addressed to the D.C. Circuit which maintained jurisdiction over the settlement, not in a collateral attack in the Superior Court. *See infra* at 573.

**6.** As part of his summary judgment motion Bebchick submitted affidavits regarding the trust company's decision to hire counsel, his phone conversation with Judge MacKinnon, and his decision to accept the appointment. Since the trial court did not consider these affidavits in reaching its decision, we do not consider them on appeal.

the complaint and the amended complaint, in my view, are clearly insufficient and accordingly the motion ... for dismissal is granted.

This appeal followed.

## II.

■ The tort appellants assert in their complaint "has many labels, but we think it may be best termed interference with prospective economic advantage." *Carr v. Brown*, 395 A.2d 79, 84 (D.C.1978). *See also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 130 (5th ed.1984). In order to survive a motion to dismiss on a claim of intentional interference with prospective economic advantage a plaintiff must allege "business expectancies, not grounded on present contractual relationships, but which are commercially reasonable to anticipate." *Carr, supra*, 395 A.2d at 84.

■ As is evident from the extended history set forth above, this is no ordinary prospective private business relationship. On the contrary, we are presented here with complex and ongoing direct judicial involvement in significant aspects of the claimed relationship. In *Carr, supra*, we had occasion to expound upon the obstacles that government involvement presents to a claim such as that made here. That case involved a claim by a developer that a nearby property owner had interfered with the developer's efforts to obtain an alley closing and zoning exceptions. *Id.* at 82–83. We affirmed a trial court's dismissal of a claim of intentional interference with prospective economic advantage because the plaintiff was "claiming interference with expectancies of profit that were wholly contingent upon the decisions of two governmental bodies, *viz.* the Transportation Committee and the Board of Zoning Adjustment." *Id.* We concluded that the expectancies which appellant claimed were "in our view simply too remote depending as they do on governmental approval." *Id.*

*Carr* is not on all fours with the case presented here, but we think it is instructive. Here the bottom-line expectancy Dowdey and Hahn contend Bebchick interfered with was the fees they would receive from the

Riders' Fund following their appointment as counsel for the trust company. However, as the D.C. Circuit made clear in its opinion denying their claim under the Takings Clause, the award of fees from the Riders' Fund was totally within the discretion of the D.C. Circuit. *See* 309 U.S.App. D.C. at 30–31, 38 F.3d at 605–06. Moreover, the very existence of the Riders' Fund and the appointment of counsel were subject to the continuing jurisdiction of the D.C. Circuit.

A perusal of the numerous cases cited above relating to this litigation reveals strikingly the close and ongoing supervision and involvement of the D.C. Circuit. The order of February 26, 1990, approving the settlement and establishing the Rider's Fund is categoric: "there is hereby established, for the benefit of the farepayers and riders of the Washington Metropolitan Area, a separate Escrow Agent/Depositary account with the Security Trust Company"; "[t]he Riders' Fund shall be held, invested and disbursed in accordance with the Escrow Agreement ... and as may be ordered from time to time by the Court of Appeals for the District of Columbia Circuit"; "this Court shall maintain supervision of the execution of the Compromise Agreement as well as the investment, disposition and disbursement of funds"; and "the Court retains jurisdiction of all matters in all subject cases until further order of the Court, and specifically retains jurisdiction to resolve any and all disputes arising under or relating to this settlement and with respect to all subject litigations." As the D.C. Circuit said in its decision rejecting appellants' Takings Clause claim, it was clear from this order that "the Court intended to retain supervision of the agreement." 309 U.S.App. D.C. at 31, 38 F.3d at 606.

■ Furthermore, the essence of plaintiff's claim here goes to an asserted irregularity in the process of Bebchick's appointment involving a member of the judicial tribunal; *viz*, an allegedly improper ex parte communication,[7] and to an allegation that the process was not as it seemed; *viz.*, approval by the court of the trust company's appointment of counsel, but rather direct appointment by the court it-

---

7. The trial court gave short shrift to the assertion that the ex parte nature of the communication was improper.

self. This assertion is made, moreover, notwithstanding the repeated subsequent characterizations by the D.C. Circuit of its action as authorizing and approving Bebchick's employment. *See* 309 U.S.App. D.C. at 29 & 33, 38 F.3d at 604 & 608, 304 U.S.App. D.C. at 244–45 & 246, 12 F.3d at 270–71 & 272, 303 U.S.App. D.C. at 287 & 291, 3 F.3d at 1571 & 1575. Thus, Bebchick's liability here must be derivative of some irregularity in the process by which he came to be appointed, and would necessarily be bottomed upon a finding to this effect.

■■■ But plainly the orders of the D.C. Circuit must be taken and acted upon in accordance with their express terms. *Cf. Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981) (noting that in the res judicata context even a patently erroneous judgment is presumptively valid and not subject to collateral attack). All judicial orders and judgments come with a strong presumption of regularity. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982). The mechanism for correction and relief must be a presentation to the tribunal itself or authority superior to it.[8] *Cf. Moitie, supra.* We must agree with the trial court that appellants at this point are engaged in an unacceptable end-run around the D.C. Circuit.

*Affirmed.*

In my view, it is not clearly improper for a[j]udge to ask an attorney if he will undertake a representation [and] for the [c]ourt and to inquire what his fee will be. I don't—there's no authority cited in the complaint for any impropriety in that process and it happens thousands of times a day, all across the country. When [c]ourts are considering appointing counsel invariably ... the [c]ourt first contacts counsel to inquire if they will accept the appointment. It's kind of stupid to appoint people not knowing whether they will take it or not. And, frequently to ascertain and determine what the fee arrangement will be.

So, the allegations in the complaint that there was a telephone call in which Judge MacKinnon asked Mr. Bebchick whether he would accept this appointment and what his fee would be is totally insufficient to set forth any sort of claim for tortious conduct on the part of Bebchick.

It's certainly not tortious conduct for an attorney to respond to such an inquiry from a Court even when that attorney knows that other attorneys may be interested in receiving the same appointment. There's no impropriety in that and that's in no way grounds for a tort action.

8. Appellants assert that it was not until they read the affidavit of Bebchick in support of his motion for summary judgment in this case that they were aware of the ex parte communication by Judge MacKinnon. That may be so, but it was only thereafter that the amended complaint was filed, and that does not explain why the proper forum for relief was not then resorted to.