**Reginald A. GAITHER, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 90–CF–714, 93–CO–10, 95–CO–888 and 97–CO–454.

District of Columbia Court of Appeals.

Argued Sept. 23, 1999.
Decided Sept. 21, 2000.

Samia Fam, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, L. Jackson Thomas, II, and Thomas R. Eldridge, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN and RUIZ, Associate Judges.

RUIZ, Associate Judge:

After a jury trial, appellant, Reginald A. Gaither, was convicted of armed premeditated murder, see D.C.Code §§ 22–2401, –3202 (1996 Repl.), and of carrying a pistol without a license, see D.C.Code § 22–3204, . for the killing, along with another man, of Charles Douglas, on Seventh Street, N.W.; in the vicinity of N Street on September 10, 1987. The trial court imposed concurrent terms of incarceration of twenty years to life on the murder conviction and one year on the conviction for carrying a pistol without a license. In his direct appeal, Gaither claims that the trial court abused its discretion by admitting, under *Drew v. United States*,[1] other crimes evidence in the form of testimony that Gaither and another man chased Douglas with a gun the night before the murder.[2] During the

---

1. 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

2. Gaither and the other man, Kenneth Ray Johnson, were charged in the same indictment with one count of armed assault with intent to kill, see D.C.Code §§ 22–501, –3202, and one count of carrying a pistol without a license, see D.C.Code § 22–3204, for the chasing incident on September 9, 1987, the night before the murder. They were also jointly charged with armed premeditated murder, see D.C.Code §§ 22–2401, –3202, and a related weapons charge for the killing on September 10, 1987. Gaither was solely charged with a third count of carrying a pistol without a license when he was arrested for the murder on September 22, 1987. The charges

pendency of the direct appeal Gaither filed numerous collateral attacks on his convictions, the denials of which give rise to the additional appeals consolidated herein.[3] Gaither's direct appeal contesting the trial court's admission of other crimes evidence and his appeal from the motions court's order of February 18, 1997, denying his *Brady*[4] and newly-discovered evidence claims are properly before the court for consideration.[5]

In the direct appeal, we affirm the trial court. We also affirm the motions court's ruling denying a new trial based on newly-discovered evidence. Because the motions court failed to make necessary factual findings and applied an incorrect legal standard to Gaither's post-conviction *Brady* claims, we remand the case for the court to make factual findings and apply the correct rule of law.

## I.  Factual Summary

### A.  Pre-trial

Gerald Fennel, a thirteen-times convicted felon, was the government's sole eyewitness to the murder of Charles Douglas. Fennel testified at a motions hearing that he looked out the window at around 7:50 p.m. on the night of Douglas' murder, Sep-

tember 10, 1987, because he was anxiously expecting a ride to a halfway house where he was serving a sentence. Fennel testified that he saw Gaither, whom he recognized as "Gator" from the numerous times he had seen Gaither in the neighborhood, along with a light-skinned accomplice, chase and shoot the decedent in the back. Six days after the shooting, on September 16, 1987, Fennel reported the incident to Detective Schwartz at the Metropolitan Police Department homicide division, but stated he would not testify in court. Fennel escaped from the halfway house on November 6, 1987, but was captured and charged with prison breach in the spring of 1988. On the same day he was arraigned for prison breach, May 4, 1988, Fennel was brought to the United States Attorney's Office, where he chose Gaither's picture from a photo array as that of Douglas' murderer. Two months later, on July 5, 1988, Fennel testified before the grand jury and adopted his May 4, 1988, identification. Subsequently, on February 27, 1990, Fennel gave a written statement to defense counsel in which he reconfirmed his prior identification of Gaither as the murderer. Fennel again adopted his prior identification of Gaither at the pre-trial

---

against Gaither concerning the events of the night before the murder and, later, at the time of arrest, were severed from the underlying trial, as were the charges against Johnson, the co-defendant. These appeals are from Gaither's convictions after trial for armed premeditated murder and one count of carrying a pistol without a license, and the trial court's denial of his post-conviction motions.

3.  In appeal No. 93–CO–10, Gaither seeks review of the trial court's December 22, 1992, order denying his motion to vacate the convictions and for other relief, including the government's disclosure of the grand jury proceedings. After denying the motion, the trial judge, Judge Ricardo M. Urbina, resigned from the Superior Court to become a judge on the United States District Court for the District of Columbia. The further proceedings were assigned to Judge Steffen Graae. Thereafter, Gaither filed appeal No. 95–CO–888, seeking review of Judge Graae's May 19, 1995 oral order denying his motion for a new trial based on *Brady* violations and

newly discovered evidence because the defense did not produce its key witness; and appeal No. 97–CO–454, seeking review of Judge Graae's February 18, 1997, written order denying, on the merits, Gaither's reprised motion for a new trial based on *Brady* violations and newly-discovered evidence.

4.  *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5.  In his consolidated brief on appeal, Gaither raises no issue concerning Judge Urbina's 1992 order, contested in appeal No. 93–CO–10, or Judge Graae's 1995 oral order, challenged in appeal No. 95–CO–888. Gaither concedes that appeal No. 95–CO–888 is moot because Judge Graae subsequently heard and denied the motion on its merits. Appeal No. 93–CO–10 has apparently been abandoned. *See Democratic State Comm. v. Bebchick,* 706 A.2d 569, 572 n. 5 (D.C.1998) ("Because these claims are not addressed in the brief on appeal we consider them abandoned.").

motion hearing on March 12, 1990, stating his certainty to be a "ten" on a scale of one to ten.

## B. Trial

At trial, Fennel testified that Gaither shot and killed Douglas and that he was certain of his identification. He also testified that he never wanted to be involved in the investigation and feared the consequences of being labeled a "snitch." The defense contended that Fennel did not see the shooting, but rather relied on street rumor to script for himself a prosecution starring role so that authorities would aid him with his own criminal troubles. The defense bolstered this theory by producing halfway house business records which indicated that Fennel returned to custody at 7:10 p.m., forty minutes before the shooting, on the night Douglas was killed. The government countered that the records did not reflect the accurate sign-in time because they were "fudged" by a halfway house counselor who signed Fennel back in early as a favor.

The defense also argued that Fennel's grand jury account of the shooting could not be reconciled with the physical evidence and the account he offered in court. Before the grand jury, Fennel testified that he saw Gaither shoot the decedent several times in the chest and once in the head. The medical examiner established that the decedent was shot four times, three times in the back and once in the arm. Fennel explained that his grand jury testimony had been mistaken, and adamantly denied under cross-examination that the prosecutor had coached him to conform his testimony to the physical evidence.

Fennel was impeached with his thirteen prior criminal convictions, with details of the murder inconsistent with his testimony, with inconsistencies between his trial testimony, his grand jury testimony, and his pre-trial hearing testimony, with positive drug tests, and with the inconsistency between the halfway house records and his testimony. To show bias, the defense stressed that when Fennel first talked to Detective Schwartz on September 16, 1987, he was pending sentencing, having just pled guilty to taking property without right, a conviction which threatened revocation of his halfway house sentence and federal parole. The defense also explored the relationship between Fennel's identification of Gaither from the photo array at the United States Attorney's Office on May 4, 1988, and Gaither's arraignment on the same day for prison breach. The government, on the other hand, portrayed Fennel as an individual who had no incentive to testify and elicited testimony that Fennel never asked for nor received help from the government.

The trial court allowed the government, over objection, to elicit testimony from Pamela McGriff, the deceased Douglas' girlfriend, that on the day before the murder, September 9, 1987, she observed Gaither, gun in hand, along with Kenneth Ray Johnson, chase Douglas near his house. Gaither "concede[d] that [whoever shot and killed Douglas] acted with premeditation, deliberation, with specific intent and malice," but insisted that he was not the shooter, and maintained that the other crimes evidence relating to the night before the murder constituted prejudicial propensity evidence. The court ruled that this evidence was admissible to prove malice and premeditation in the murder and instructed the jury that McGriff's testimony could be used by the jury only for that limited purpose:

> [I]f you have reason to doubt that Reginald Gaither shot and killed Charles Douglas based on the evidence presented regarding the night of the shooting, September 10, 1987, then you may not consider the evidence of the alleged conduct on September 9 for any purpose.
>
> If you find beyond a reasonable doubt that Reginald Gaither shot Charles Douglas, then you may consider evidence about the defendant's alleged conduct on the night of September 9, 1987, for the purpose of determining whether

it shows or tends to show that Mr. Gaither acted with malice and premeditation.

You are not required to accept this evidence, and whether you accept it or not is a matter for you to decide.

But if you decide to accept it, you may do so only for the limited purpose I have just explained and you may not consider it as tending to show in any other way the defendant's guilt of the offense for which he is now on trial.

Despite the trial court's instruction, after three hours of deliberation the jury sent a note asking if it could "consider Pamela McGriff's testimony as grounds to give credence to Gregory F[en]nel's testimony?" The trial court responded to the note by rereading its original instruction on the limited purpose for which the other crimes evidence could be used and added the sentence, "[y]ou may not use the testimony of Ms. McGriff in determining who shot Mr. Douglas." The next morning, after having deliberated for a total of seven and a half hours, the jury then sent a note stating that it was "hopelessly deadlocked on some points and an issue." In reply, the trial court acknowledged receipt of the jury's note and requested that they continue their deliberations. After further deliberation, at 3:00 p.m. that afternoon, the jury sent a note indicating that it had reached a verdict, and found Gaither guilty on both counts.

### C.  New Trial Motion

On January 26, 1994, Gaither filed a new trial motion alleging *Brady* violations and newly-discovered evidence. The motion was based on a July 27, 1993, statement given to the defense in which Fennel recanted his positive identification of Gaither because he had not seen the perpetrators' faces and stated that he was never certain of the identification, contrary to what he had testified at trial. In the statement,

Fennel further averred that Detective Schwartz had indicated to Fennel that he should choose Gaither's photograph from the array on May 4, 1988, the day when he first identified Gaither as the murderer. Less than one month later, Fennel appeared at the United States Attorney's office, repudiated his July 27, 1993, statement to defense counsel and apologized to Detective Schwartz for his accusations, explaining that he was angry at the trial prosecutor for having abandoned him. Notwithstanding his repudiation of the July 27, 1993, statement to the defense, on May 9, 1994, in a second sworn statement to defense counsel, Fennel re-adopted his July 27, 1993, statement recanting his identification of Gaither and impugning the prosecutors' actions. Four days after that, on May 13, 1994, Fennel again appeared at the United States Attorney's Office, again repudiated his recantation, and reaffirmed his identification of Gaither. On June 13, 1994, Fennel executed an affidavit formally repudiating the July 27, 1993, statement, affirming the accuracy of his prior testimony, and declaring that he gave his various statements to the defense out of fear that he would be exposed by Gaither as a "snitch." [6]

The motions judge held an evidentiary hearing pursuant to the motion for a new trial. Testimony at the hearing revealed that notwithstanding an order from the court that Fennel should not be incarcerated in proximity to Gaither, beginning on July 6, 1993, they were held on the same corridor of the District of Columbia Jail, less than a dozen cells apart, and shared shower and recreational facilities. After two weeks of incarceration, during which Fennel did not recognize him, Gaither called Fennel over and revealed his identity. Fennel was frightened, but Gaither did not threaten him. Rather, Gaither noted that "if it was something he wanted to do to [Fennel], it could have been done."

---

6.  The motions judge wryly observed that "May and June of 1994 were busy months for Fennel on the affidavit front."

Immediately after this encounter, Fennel attempted to contact the trial prosecutor, who declined to speak with him unless Fennel approached through counsel. Fennel testified that he felt "bitter and angry" about this rebuff and for that reason recanted his identification of Gaither in the July 27, 1993, statement to defense counsel. Fennel once again insisted that he witnessed the murder and reaffirmed his description of the shooter, but testified that he was not certain that Gaither was the shooter. He further testified that the prosecutors always cautioned him to tell the truth, and that every time he had identified Gaither as the murderer it was true to the best of his recollection at the time he offered it.

To corroborate Fennel's July 27, 1993, statement recanting his identification of Gaither, the defense called Gwendolyn Payne and Dietrich Trent, grand jury witnesses who did not testify at trial. Trent and Payne testified about potentially suggestive identification procedures used by prosecutors Thomas and Long–Doyle, and by Detective Schwartz. The government called no witnesses to counter these allegations.

Gaither argued that the following facts, whether singly or combined, constituted favorable material evidence known to the government which it was bound to disclose to the defense for use at trial under *Brady*: the suggestive identification procedures adverted to by Trent and Payne; government inducements for Fennel's testimony, including daily payments which Fennel received to appear at the United States Attorney's office during a period of between two weeks and one month before trial; a one-time $100 loan to Fennel by a prosecutor, which Fennel repaid the following day; Fennel's uncertainty concerning his identification of Gaither; Fennel's theft of witness vouchers, for which he was later tried and convicted; and Fennel's drug use before and during trial.

Gaither also argued that to the extent the government was not charged with knowledge of the above matters, a new trial was still required because newly-discovered evidence revealed that Fennel had falsely made a positive identification of Gaither as the killer when he was really uncertain; Fennel was on drugs during the shooting incident and at trial; Fennel falsely testified about where the bullets hit the decedent; Fennel had stolen illegal duplicate vouchers; Fennel lied to the trial judge concerning his tardiness at trial, which he claimed resulted from a threat against his niece because of his testimony against Gaither; and the prosecutor had corruptly influenced Fennel's identification and testimony.

In his order denying Gaither's motion for a new trial, the motions judge focused on the test in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), for determining the admissibility of identification testimony, not the test set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, concerning the government's obligation to disclose evidence favorable to the defense. The judge considered the issue to be whether "Fennel's trial testimony identifying Gaither as the shooter can be deemed reliable after considering any suggestive influences that may have been brought to bear to secure his testimony." Notwithstanding Fennel's claims that the detective and prosecutors had influenced his identification of Gaither, the court found that Fennel's more recent statements about "not being positive" or being unable to identify Gaither were made because Fennel simply did not want to be involved. The motions court's view was that Fennel's "misfortune was to have seen a murder and recognized the killer." Accordingly, the court found Fennel's recantation to be "incredible and his at-trial identification of Gaither reliable."[7] Apparently considering the credibility determination to be dispositive of the entirety of

7. Appellant does not challenge the trial court's determination of reliability.

Gaither's claims, the motions judge concluded that Gaither's *Brady* claims "lacked substance" because he found Fennel's identification to be reliable.

## II. Direct Appeal—Other Crimes Evidence

█ In his direct appeal, Gaither argues that the trial court abused its discretion when, over objection, it allowed Pamela McGriff to testify that she observed Gaither and another individual chasing the decedent on September 9, 1987, the evening before the murder, with gun in hand, for the purpose of proving malice and premeditation in committing the murder the following night. Gaither argues that because malice and premeditation were uncontroverted, the trial court committed reversible error by allowing the testimony, relying on this court's holding in *Thompson v. United States*, 546 A.2d 414, 423 (D.C. 1988) ("[W]here intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law."). Gaither argues that the *Thompson*

holding applies to all state of mind rubrics, such as premeditation or malice. We need offer no opinion concerning this proposition, because even if admission of McGriff's testimony was error, the error was harmless.[8]

The prejudice that inheres in the admission of *Drew* evidence is the likelihood that juries will draw from other crimes evidence an improper inference of criminal disposition. *Drew, supra* note 1, 118 U.S.App.D.C. at 15, 331 F.2d at 89; *Thompson*, 546 A.2d at 424-25. Because Gaither's defense theory was that he was not the killer, the possible prejudice would result from the jury's use of McGriff's testimony concerning Gaither's activity the night previous to the murder to infer Gaither's identity as the murderer. The trial court instructed the jury, however, that it could only consider McGriff's testimony concerning Gaither's conduct on September 9, 1987, for the purpose of determining premeditation and malice, once it had determined beyond a reasonable doubt that Gaither was the murderer.[9]

8. As we have noted, "[L]ive testimony or tangible evidence offers ... many significant advantages over a stipulation ... for a stipulation will almost never have the same probative value and persuasive power as the testimony of a live witness or a tangible object." *Daniels v. United States*, 738 A.2d 240, 251 (D.C.1999), *cert. denied sub nom. Davis v. United States*, — U.S. —, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). Therefore, "[o]nly when there is no cognizable difference in evidentiary significance between an offered stipulation and a challenged piece of evidence, and the challenged evidence presents a real danger of unfair prejudice, may a trial court force a party to accept the stipulation." *Id.* (internal quotations and citations omitted)

9. Although the court in *Thompson* questioned the effectiveness of limiting instructions to quell the prejudice inherent in *Drew* testimony when intent is uncontroverted, *see Thompson*, 546 A.2d at 427 (noting that "the danger that application of the intent exception would swallow up or emasculate the propensity rule is substantial"), the *Thompson* court specifically commended the substance of the federal trial judge's instruction to the jury in *Enriquez v. United States*, 188 F.2d 313, 315–16 n. 2 (9th Cir.1951), which:

contained a direction to the jurors that they must first determine, without considering the prior bad act at all, whether the defendant did the act charged. The judge further instructed that if, and only if, the jury finds that the defendant did the acts, then it may consider the prior misconduct, but only in connection with the intent which the defendant did the act for which he is on trial. *Thompson*, 546 A.2d at 426. We note that the trial court's instructions followed this commended framework.

We also note that, notwithstanding the fact that malice and premeditation were uncontested, McGriff's testimony might properly have been admitted to prove motive and, inferentially, identity. *See Hazel v. United States*, 599 A.2d 38, 41 (D.C.1991), *cert. denied*, 506 U.S. 939, 113 S.Ct. 374, 121 L.Ed.2d 286 (1992) ("[W]here the identity of the decedent's murderer is drawn into issue, evidence of prior altercations of a substantive and violent nature between the accused and the decedent is probative provided such incidents are proved by something other than hearsay.") (quoting *Green v. United States*, 580 A.2d 1325 (D.C.1990)). Thus, contrary to being prejudiced by admission of the evidence, Gaither may have gained a benefit

After the jury sent a note asking if it could "consider Pamela McGriff's testimony as grounds to give credence to Gregory Fennel's testimony," the trial court responded by rereading its original instruction on the limited purpose for which it could consider McGriff's testimony, and added the further cautionary instruction, "[y]ou may not use the testimony of Ms. McGriff in determining who shot Mr. Douglas." *See supra* part I.B.

■ The jury is presumed to follow the trial court's instructions. *See Hairston v. United States,* 497 A.2d 1097, 1102 (D.C. 1985). "[T]his is a crucial assumption for our theory of trial depends on the jury's ability to do so." *Thompson,* 546 A.2d at 425 (citations omitted). As this court further noted in *Thompson,* concerning the applicability of this presumption to other crimes issues:

> [L]imiting instructions can and in some cases must be provided, and we are constrained to assume that when they contain realistic rather than theoretical distinctions, and when they are clearly and understandably delivered, they will reduce, if not dissipate, the danger of unfairness and prejudice. In weighing probative value against prejudicial effect, courts should inquire as to whether the risk of prejudice has been or can be meaningfully reduced by the trial judge's instructions.

*Id.* at 426. Here, the jury twice was instructed in clear and easily understandable terms how it was to consider McGriff's testimony. In its deadlock note, the jury did not again question the proper use of McGriff's testimony, so we have no cause to be concerned about jury confusion. We are satisfied that the trial court's instructions meaningfully reduced the risk of prejudice to Gaither so that even if it was error to admit McGriff's testimony, the error was harmless.

from the resulting limitation in the trial court's instruction.

## III. Collateral Appeal—Motion for New Trial

### A. *Brady Claims*

Gaither and the government agree that the court applied an incorrect legal standard to Gaither's *Brady* claims when it applied the *Manson v. Brathwaite* [10] test for determining the admissibility of identification testimony. Nevertheless, each urges that this court can reverse or affirm on the undisputed facts before it. Gaither argues that he is entitled to a new trial because, based on undisputed facts, the government withheld evidence that materially impeached Fennel, the government's principal witness. The government contends that the record before the court is sufficient to affirm Gaither's conviction because the motions court did not credit Fennel's recantation and that an acquittal would not likely result from a jury's consideration of the claimed newly-discovered evidence, given that Fennel was soundly impeached at trial and any newly-discovered evidence was merely further impeachment material. Alternatively, both Gaither and the government agree that a remand is necessary should we conclude that the findings are insufficient to affirm or reverse. We conclude that a remand is necessary.

■ A violation of due process under *Brady* occurs when the prosecution fails to disclose, before or during trial, evidence favorable to the defense, *see Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *see also Black v. United States,* 755 A.2d 1005, 1010 (D.C.App.2000), and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Black,* at 1010. A reasonable probability of a different result exists when the government's evidentiary suppression "undermines confidence in the outcome of the

10. 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

trial." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also Farley v. United States,* 694 A.2d 887, 889 (D.C.1997). "Impeachment evidence ... as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375 (citations and quotations omitted); *see also Coleman v. United States,* 515 A.2d 439, 448 (D.C.1986).

█ In his motion for a new trial Gaither identified a number of items of impeachment evidence the cumulative effect of which, he argued, warranted a new trial. See *supra* part I.C. The court made a limited number of findings regarding this evidence, finding that there was no evidence that Fennel told prosecutors he could not identify the killer or that prosecutors knew Fennel was on drugs or stealing witness vouchers during and shortly after the trial.[11]

Although it is clear that the court found Fennel's recantation of his identification of Gaither to be "incredible," it is not clear from a reading of the order denying Gaither's new trial motion that the court completely rejected other aspects of Fennel's testimony. For instance, the motions court did not reject Fennel's allegation that the prosecutors engaged in suggestive conduct when Fennel identified Gaither. Rather, because its analysis was concerned with credibility, the motions judge ignored the *Brady* consequences of Fennel's testimony, simply noting that "[e]ven giving [Fennel] the benefit of the doubt as to his allegations of suggestive conduct ... the Court is persuaded that Fennel was not misdirected to an identification he could

not make." We do not read this as a finding that there was no suggestive procedure, nor can we infer that, even if there was a suggestive procedure, the motions court determined that the government's failure to disclose it did not undermine confidence in the outcome of the trial. *See Kyles,* 514 U.S. at 445, 115 S.Ct. 1555 (noting that *Brady* evidence can be used to attack "the thoroughness and even the good faith of the investigation"). The court also made no finding concerning Gaither's claim that the government improperly paid Fennel to appear at the United States Attorney's Office on ten to twenty occasions, which the government claimed were for witness preparation. At the new trial motion hearing, Fennel testified that he was compensated through the United States Marshal's Service for daily voluntary appearances at the United States Attorney's Office for the "month ... two weeks," "two [weeks;] it might be longer," at a time other than when he was under subpoena. The government concedes that if Fennel's testimony is credited in this regard, the government paid Fennel daily for between two weeks and one month for appearing at the United States Attorney's Office, not for witness fees.[12] The motions court, however, made no findings concerning the extent of these payments,[13] as well as the prosecutor's loan, and other favors perceived by Fennel. Nor did the motions court apply the ultimate test for *Brady* evidence, by considering the probability of whether evidence of improper suggestions and payments by the government to Fennel would materially influence the jury's assessment of Fennel, a witness whom the motions court judged to be "a very fluid individual in the sense that he goes with the flow, whatever it may be, and is anything but a principled human

---

11. We express no opinion as to these findings at this time.

12. Fennel testified that his voucher payment was $40 per day. If Fennel's testimony is credited, and he received $40 per day for appearing daily at the offices of the United States Attorney for two weeks to one month

prior to trial, then he would have received between $400 and $800 from the government prior to his trial testimony.

13. At the hearing, however, the motions judge noted that these payments were "extraordinarily puzzling" and did not "smell" right.

being." [14]  Rather, the motions court observed that "[e]ven if accepted as true ... [the] one-day loan to Fennel of $100, free lunches, and promises of help and friendship are not matters the government is obliged to disclose under *Brady* ... [unless] Fennel's recantation is believed."

In conducting our review of appellant's *Brady* claims, we rely on findings of fact made by the trial court, and it is useful to have the trial court's assessment of the alleged *Brady* material because "the trial judge was on the scene.  He was in a far better position than we are to assess the atmospherics of the case" and determine whether the failure to disclose materially prejudiced the defendant.  *Edelen v. United States*, 627 A.2d 968, 972 (D.C.1993). [15]  Consequently, we remand for the court to make complete findings of fact and to apply the correct legal standard to its findings.

### B.  Newly–Discovered Evidence

Gaither also argues that the motions judge applied the wrong legal standard to his motion for a new trial based on newly-discovered evidence, because the motions judge restricted himself to consideration of the credibility of Fennel's recantation, but failed to consider whether other newly-discovered evidence required a new trial.  Although Gaither does not challenge the court's finding that Fennel's recantation was incredible, [16] Gaither claims that the motions court failed to make findings as to the other newly-discovered evidence alleged in his motion for a new trial:

> The prerequisites for granting a new trial based on newly discovered evidence are that: (1) the evidence must be newly discovered; (2) the moving party must show diligence in efforts to procure the new evidence; (3) the material must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such a nature that an acquittal would likely result from its use.

*Byers v. United States*, 649 A.2d 279, 287 (D.C.1994); *see also (Joel) Smith v. Unit-*

---

**14.** The motions judge expounded on the dim view he took of Fennel and the government's improper handling of such a "susceptible" witness:

> Mr. Fennel's testimony stands uncontradicted as to what happened ... the relationship that he developed with Mr. Thomas, which certainly sounds to me as if it went way beyond the line of what is an appropriate relationship between an assistant U.S. attorney and what has been deemed as a key government witness.
>
> I am very bothered by this.... It doesn't smell right.  It makes me terribly uncomfortable that this witness was handled in this way.
>
> I certainly have got to tell you this: I have a sense that this is a truly corrupted individual; Mr. Fennel....  [My] entire sense of this man is that he is a fundamentally untruthful individual, and that it appears to me that during the critical time periods, the Government may have—may have manipulated him and stroked him to produce the testimony that he came up with at the trial.  I mean, I find Mr. Fennel to be a person that I—I wouldn't credit.
>
> ....
>
> But if he is corrupt, if he is inherently corrupt ... and the Government works him over and—and, you know keeps giving him

these 40 bucks a day for being a witness and reporting to the U.S. Attorney's Office for an extensive period of time, and we now know that he was also using drugs during this period of time, we also know that he stole, you know, countless vouchers from your office and got money off them ... my sense of the man is that he is totally corrupt, and for the Government to manipulate him and use him, and even if it is done in some form of good faith that this is an appropriate way of working with a witness in preparation for trial, this man strikes me as so susceptible.

**15.** We are aware that this policy is not fully served in the present case because, although the motions judge was able to assess the witness' demeanor at the hearing on the motion for a new trial, he did not preside over the trial.

**16.** "If the motion for a new trial is based on the recantation of a witness, the trial court first determines the credibility of the recantation and that witness's trial testimony.  Only if the recantation is credible need the court determine the effect that the recantation would have had on the jury."  *Herbin v. United States*, 683 A.2d 437, 441 (D.C.1996) (footnote and citation omitted).

 

*ed States,* 466 A.2d 429, 432–33 (D.C.1983). The court will carefully scrutinize the offer of evidence from one who "has little to fear" in offering exculpatory evidence. *Cf. Byers v. United States,* 649 A.2d 279, 287 (D.C.1994) (co-defendant has little to fear in attempting to exculpate others after conviction). "Each case ... must be judged on its own particular facts." *Prophet v. United States,* 707 A.2d 775, 778 (D.C.1998). The decision to deny the motion is within the trial court's discretion, and we review for abuse of that discretion. *See Derrington v. United States,* 488 A.2d 1314, 1339 (D.C.1985), *cert. denied sub nom. Grayson v. United States,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

■ The motions court's order sets out the correct legal standard for granting a new trial based on newly-discovered evidence, but primarily considered whether the recantation qualified as newly-discovered evidence warranting a new trial. Having found Fennel's recantation to be incredible, and his identification of Gaither reliable, the motions court dismissed the claim that Assistant United States Attorney L. Jackson Thomas, II, manipulated Fennel into giving false testimony. The trial court also found that Fennel's testimony alleging improper manipulation by the prosecutor was "undermined by his recantation testimony" that the prosecutor "always wanted me to tell the truth." The court did not make specific findings, however, concerning Gaither's remaining claims of newly-discovered evidence, specifically, that Fennel was on drugs during the incident and at trial, falsely testified about where he saw the bullets hit the decedent, illegally obtained duplicate vouchers, and lied to the trial judge concerning his tardiness at trial which he claimed resulted from a threat against his niece because of his testimony against Gaither.

The government argues that we need not remand for findings to dispose of the new trial motion because the proffered evidence fails the legal prerequisite that the evidence "must not merely be ... impeaching." *Byers,* 649 A.2d at 287. We agree that each of the remaining claims speak to Fennel's credibility and are thus impeachment evidence. At trial Fennel was impeached with the discrepancy in the sign-in sheets to the halfway house on the night of the murder, numerous previous convictions, differences between his grand jury, pre-trial and trial testimony, the possibility of bias resulting from government assistance with pending charges, and the circumstances surrounding his original identification of Gaither. Given the scope of this impeachment, we conclude that the alleged newly-discovered evidence, even if credited, is impeachment evidence not "of such a nature that an acquittal would likely result from its use." *Id.* Because Gaither's proffered evidence fails the third and fifth requirements for a new trial based on newly-discovered evidence, there is no need to remand for further consideration of Gaither's new evidence claims.

Accordingly, we affirm in part and remand the case for further proceedings consistent with this opinion.

*So ordered.*