**Larry D. WHITE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 96–CF–1167.**

District of Columbia Court of Appeals.

Argued Nov. 14, 2000.

Decided Dec. 14, 2000.

---

Roosevelt F. Brown, III, Washington, DC, appointed by the court, for appellant.

L. Marie Leggon, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Alan M. Boyd, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and WASHINGTON, Associate Judges.

REID, Associate Judge:

After a jury trial, appellant Larry D. White was convicted of carrying a pistol without a license, in violation of D.C.Code § 22–3204(a) (1996); possession of an unregistered firearm, in violation of D.C.Code § 6–2311(a) (1995); and unlawful possession of ammunition, in violation of § 6–2361(3).[1] He filed an appeal,[2] con-

---

1. The jury could not reach a verdict on two other drug-related charges. With respect to his three convictions, imposition of sentence was suspended, and White was placed on three years probation, with the condition that

he enter and complete an urban services program.

2. In a motion to dismiss the appeal, the government contended that White's appeal was a

tending that the trial court erred by denying his motions: (1) to suppress evidence; (2) for a continuance or a mistrial, based upon the government's failure to produce exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (3) for judgment of acquittal due to the insufficiency of the government's evidence. Finding no error, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government's evidence showed the following events. Around 2 a.m. on July 12, 1995, a woman drove up to a police vehicle in Anacostia Park in the Southeast quadrant of the District of Columbia. Officer Michael Foran, who was seated in the police car, testified at a hearing on White's motion to suppress evidence, that the woman "appeared nervous" and recounted an incident as she was approaching a nearby police station to pick up her nephew who had been arrested earlier on a traffic offense. When the woman drove into the parking lot of the police station, a station wagon "pulled in front of her" and "spooked her." She was "spooked" because she "believed or she had knowledge that her nephew ... had been beefing [(arguing or fighting)] with people and that someone was out to shoot him, and she was concerned that the occupants in the car were going to try and shoot her nephew when he left the station." The woman described the location where the station wagon had parked, saying that it was "way back to the right ... [of] the gate at the entrance of the parking lot" of the police station.

Officer Foran followed the woman back to the police station and observed the station wagon in an obscure spot of the police parking lot, normally reserved for impounded cars. He characterized its location as in "one of the areas where even *if* you drive with your headlights on, as you are pulling out of the parking lot there, unless you are specially looking for a car in there, you see shapes of cars, but you wouldn't see specific vehicles." The station wagon was in a fenced area, in front of a dirt berm, and behind a van. Its lights were off. Officer Foran was not accustomed to seeing cars with passengers parked in that location because it is "used for seized vehicles or vehicles people leave there over night when they are out of town." As he stated: "In the three and a half years I worked in Anacostia Park I have never seen any occupied cars ... be parked there any other hour of the day ... especially at two o'clock in the morning."

Officer Foran accompanied the woman into the police station, alerted another officer about her concern, and then went back to again observe the station wagon. He pretended to fill his police vehicle at a gas pump near the location of the station wagon while he continued to watch the station wagon. He called another police officer, Scott Dahl, for assistance. Although Officer Foran "couldn't see shapes that well," he "could see heads move to a degree ..." in the station wagon. He watched for a few additional minutes. When Officer Dahl arrived, the two drove the short distance to the station wagon, pulled in front of it and saw "heads in the car all ducked down in the seats."[3] In referencing a ducking motion, Officer Foran stated at trial: "As Officer Dahl and I approached the vehicle I saw what looked like heads in the car all ducked down, in motion like this, and an apparent motion, apparent attempt to hide from us or hide something in the car." White was in the driver's seat; two juvenile females were in the car, one seated next to White, and the other in the back seat with a male passenger.

day late, and therefore, untimely. However, this court denied the government's motion.

**3.** Officer Dahl testified, at trial, that before his exit from the station wagon, White "was kind of like leaned to the side like, like he was leaning on the passenger door compartment like over to the side."

Using their flashlights, the officers ordered the four persons inside the station wagon to "sit up in the seats. . . ." Officer Foran stated that he "was quite concerned about [his] safety . . . because it was an unusual act of someone to duck down as a police approach especially with the information the lady gave me." In addition, White was six feet two inches tall and weighed approximately 270 pounds. Officer Foran ordered the occupants to "step out of the car." After the occupants exited the station wagon with their hands raised, Officer Foran frisked them for weapons, but found none on their person. The passengers were secured for safety reasons, and to "temporarily detain them at the scene." White was handcuffed to a roof rack located on top of the station wagon. Because of his concern for his safety, Officer Foran looked into the vehicle for weapons while he was standing at the side of the car by the driver's seat. With his flashlight in hand, he "observed what appeared to be a [handgun] on the [floorboard] by the driver's seat." Part of the gun was under the seat. Officer Dahl testified, at trial, that: "[W]hen Officer Foran . . . advised me there was a weapon in the car, . . . I looked and I saw it. I could see it from the passenger side. If I looked inside the vehicle, looked down in the car I could see the weapon." In addition, he stated: "It was partially under the seat. It was sticking out. It is a considerable amount I could see from the passenger side. If I put my head inside the compartment, I could see it on the other side, underneath the seat. I could see it sticking out." Once he saw the gun in the station wagon, Officer Foran placed the occupants of the station wagon under arrest, secured them and proceeded to search the station wagon. Among other items, he retrieved from the station wagon a twenty-two caliber loaded revolver, which was the handgun that the officers saw on the floorboard near the driver's seat.

White testified in his own behalf, both at the suppression hearing and at trial, ac-

knowledging that he was in the station wagon, in the location identified by Officer Foran. He asserted that the occupants of the vehicle "were sitting slumped in a relaxed position, I would say, more or less comfortable position. . . ." He denied making a ducking or bending motion while seated in the car. After the police car pulled in front of the station wagon, the police officers "got out of the car and proceeded to pull their [handgun] out, and told us to show [them our] hands." White and the other male passenger were "pulled" out of the station wagon. White was handcuffed and frisked. The officers searched the car for about 15 or 20 minutes, and then put White and the other male into the police car. White denied that he saw a gun, or had placed a gun in the station wagon "on that evening."

## ANALYSIS

### The Motion to Suppress

White contends, first, that the trial court erred by denying his motion to suppress, because "the seizure of tangible evidence flowed directly from [an] illegal warrantless arrest." The government argues that, under the totality of the circumstances, the police had a reasonable, articulable suspicion to remove White from the station wagon, and subsequently, lawfully seized the gun which was in plain view when the officers looked into the station wagon.

Our review of the trial court's disposition of a motion to suppress " 'is limited.' " *Thompson v. United States,* 745 A.2d 308, 312 (D.C.2000) (quoting *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989)). "We must 'defer to the trial judge's finding of evidentiary fact,' " *Dancy v. United States,* 745 A.2d 259, 272 (D.C.2000) (quoting *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996), *cert. denied,* 519 U.S. 1156, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997)), and view " 'all reasonable inferences therefrom . . . in favor of sustaining the trial court ruling.' "

*Thompson, supra,* 745 A.2d at 312 (quoting *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc) (other citation omitted)). " 'Essentially[,] our role is to ensure that the trial court has a substantial basis for concluding that no constitutional violation occurred.' " *Id.* (quoting *Lawrence, supra,* 566 A.2d at 60) (citation omitted). We review the legal issue *de novo. See Maddox v. United States,* 745 A.2d 284, 289 (D.C.2000); *see also Ornelas v. United States,* 517 U.S. 690, 691, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

The trial court "credit[ed] the version of the events [given] by the police," specifically referencing Officer Foran's encounter with the woman who informed him about the station wagon and her concerns; Officer Foran's verification of the station wagon's location at 2 a.m.; his observation of the vehicle, the "ducked down" heads of the passengers; and the size of White compared with that of Officer Foran. The trial judge stated: "I do not credit Mr. White's representation that [the police] had guns drawn," or that they "snatched" or pulled White out of the car. However, the judge found that White "was cuffed to the luggage rack of the car," but that, under the totality of the circumstances, this temporary restraint was reasonable.

■ In determining whether the trial court erred by denying White's motion to suppress, we reiterate that: "A police officer must have a reasonable, articulable suspicion that criminal activity is afoot before that officer lawfully can stop (or seize ) an individual without that person's consent." *Speight v. United States,* 671 A.2d 442, 446 (D.C.1996) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In that regard, "[t]he Fourth Amendment [to the Constitution] requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). Thus, it is insufficient for a police officer to merely articulate " 'an inchoate and unparticularized suspicion or hunch.' " *Id.* (quoting *Terry, supra* 392 U.S. at 27, 88 S.Ct. 1868) (internal quotation omitted).

■ In this case, the emergence of Officer Foran's reasonable, articulable suspicion began with information supplied by an in-person citizen informant's account relating to the station wagon which White was driving. "We have recognized that a citizen informant, particularly one who identifies herself, is a 'more credible source than a paid police informant.' " *Davis v. United States,* 759 A.2d 665, 670 (D.C.2000) (quoting *Parker v. United States,* 601 A.2d 45, 49 (D.C.1991) (other quotation omitted)). The citizen informant in this case identified herself by reference to her nephew who was at the police station because of a traffic violation, and based upon her nephew's address, could be located in the future. Thus, "[i]n identifying herself, she exhibited a willingness to be held accountable for the information she had provided to police." *Parker, supra,* 601 A.2d at 49. Although her information provided no detail about the alleged dispute her nephew apparently had with some people, or the reason why someone would want to shoot her nephew, other details were verifiable. In that regard, Officer Foran confirmed, by his own observation, that the citizen informant's information about the remote location of the station wagon, in a fenced area on the parking lot, backed against a dirt berm, was accurate. The place where the white station wagon was located was "used for seized vehicles or vehicles people leave there over night when they are out of town." Indeed, Officer Foran testified that in his "three and a half years [of] work[ing] in Anacostia Park [he had] never seen any occupied cars there especially at two o'clock in the morning."

Before taking any action, however, the officer watched the station wagon for a few minutes, while remembering the citizen informant's concern that the occupants of the station wagon were there to shoot her nephew. The officer noticed that it was

after 2 a.m., the lights of the car were off, and that heads moved. When the police officers drove up to the station wagon they saw "heads ducked down."[4] These circumstances were sufficient to provide "a 'minimal level of objective justification,'" *Sokolow, supra,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Delgado, supra,* 466 U.S. at 217, 104 S.Ct. 1758), for making an investigative stop of White and the other occupants of the station wagon. *See also Holston v. United States,* 633 A.2d 378, 383 (D.C.1993) (" '[I]ndependent police observation of suspicious conduct can offer confirmatory support for a tip that otherwise would be inadequate' "); *Gomez v. United States,* 597 A.2d 884, 889 (D.C.1991); *United States v. Johnson,* 540 A.2d 1090, 1094 (D.C.1988). These circumstances also serve as a basis for rejecting White's argument that the citizen informant should be discounted because she was paranoid. Indeed, nothing in the record before us suggests that the citizen informant was paranoid, or that the officers acted on "an inchoate and unparticularized suspicion or 'hunch.'" *Sokolow, supra,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry, supra,* 392 U.S. at 27, 88 S.Ct. 1868) (internal quotation omitted).

 In light of Officer Foran's concern about his safety because of the citizen informant's account, the fact that the occupants of the station wagon had their "heads in the car all ducked down in the seats," and the size of White, it was reasonable for the officers to instruct the occupants to step out of the vehicle and to handcuff them before engaging in additional investigation.[5] *United States v. Christian,* 337 U.S.App.D.C. 402, 408, 187 F.3d 663, 669 (D.C.Cir.1999) ("as appellate judges ... we must defer to [a street

officer's ] 'quick decision as to how to protect himself and others from possible danger' ") (quoting *Terry, supra,* 392 U.S. at 28, 88 S.Ct. 1868); *Womack, supra,* 673 A.2d at 609 (use of handcuffs did not exceed the scope of a legitimate investigative detention); *see also Maddox, supra,* 745 A.2d at 289 ("The touchstone of the Fourth Amendment is reasonableness."); *Hicks v. United States,* 730 A.2d 657, 660 (D.C. 1999) (" '[T]he scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances.' ") (quoting *In re M.E.B.,* 638 A.2d 1123, 1127 (D.C.1993)). Thus, under the circumstances, it was also reasonable for the officers to take a look into the car to see if they saw any visible weapon. Officer Foran testified that he used a flashlight and "looked in the car prior to entering it, and saw a [handgun] on the [floorboard] of the driver's side." It was situated "on the driver's seat, directly below where a person would normally keep ... the right thigh...." After informing Officer Dahl that he had seen the weapon, the officers placed the occupants of the station wagon under arrest. Officer Dahl also verified the presence of a gun in the car, which he "could see ... from the passenger side" of the car. Since the gun was in plain view on the driver's side near the spot where White's right thigh would have been positioned, the officers had probable cause to seize it. Thus, the doctrine of plain view justified the seizure of the gun. *See Mitchell v. United States,* 746 A.2d 877, 886 (D.C.2000) ("[A]s [the police officer] was lawfully positioned to see inside [the defendant's] car, his use of a flashlight to illuminate the interior, which enabled him to observe [specified

**4.** At trial, Officer Foran stated: "As Officer Dahl and I approached the vehicle I saw what looked like heads in the car all ducked down, in motion like this, and an apparent motion, apparent attempt to hide from us or hide something in the car."

**5.** Officer Foran testified during trial: "[Officer Dahl] and I drove up in the car, got out of

our cars, ordered everybody in the car to raise their hands so we could see them. We weren't sure why they were ducking down. We were concerned for our safety. It's very unusual for a car load of people first of all to be parked in a dark and unused parking lot, part of the parking lot, and ducked down when the police arrive."

objects] did not constitute a 'search' within the meaning of the Fourth Amendment.") (citations omitted); *see also Gomez, supra,* 597 A.2d at 892 ("If the removal of [the appellant] from the vehicle was lawful, then the discovery and seizure of the pistol in plain view on the floor of the car, and near the location where [the appellant] had been sitting, were proper."). Consequently, we conclude that the trial court properly denied White's motion to suppress evidence.

### The Brady Issue

White's second major argument is that the trial court erred by denying his motion for a continuance or mistrial when the government failed to timely produce exculpatory material, the statement and name of Latisha Hill, a female passenger in the station wagon, as required by *Brady, supra.* The government maintains that Ms. Hill's statement was not exculpatory, and that even if her name had been disclosed earlier than the time of trial, the outcome of the trial would not have been different.

Before analyzing the *Brady* issue, we set forth the pertinent factual and procedural background. On March 27, 1996, defense counsel received a telephone call from the prosecutor stating that a witness who appeared before the grand jury did not see a gun in the station wagon. The name of the witness, who was a juvenile at the time of the incident, was not revealed. About two weeks later, on April 15, 1996, one day before the hearing on his motion to suppress, White filed a motion to compel disclosure of exculpatory information. By the second day of trial, which began on April 18, 1996, the government had not released the name of the witness. In addition, during his testimony on April 19, 1996, Officer Dahl revealed that he had taken statements from two female witnesses. One statement, that of LaKeeyia Pixley had already been given to defense counsel. The trial judge ordered the government to give the other statement, that

of Ms. Hill, to defense counsel. Defense counsel maintained that Ms. Hill's statement "tend[ed] to be more exculpatory than" Ms. Pixley's. Later, defense counsel advised that he could not locate Ms. Hill because he did not have her address.

The court revisited the *Brady* issue on Monday, April 22, 1996, when defense counsel advised the court that Ms. Hill was somewhere in Virginia, and would not return until Thursday or Friday of the same week. He requested a continuance or a mistrial. At first, the trial judge indicated that she would grant defense counsel until Monday of the following week to find Ms. Hill. Later, however, she instructed defense counsel to use his "best efforts to find" Ms. Hill that same evening. At the beginning of the following day, April 23rd, the prosecutor broached the *Brady* issue again, requesting clarification of the court's ruling and arguing that Ms. Hill's statement did not constitute *Brady* material. The trial judge retorted that, under some analyses, "it's material and it could assist the defendant, if certain information were elicited . . . ."

Furthermore, the trial judge determined from defense counsel that "[t]he only information in the statements given by Ms. Hill is that she did not see a gun," and ultimately ruled that: "The Court will go on with this trial at this time. We will not await the arrival, discovery, the finding of Ms. Hill. The Court finds that, although . . . her information is critical, it is not essential, . . . and that Mr. White has in fact, testified, about the gun." The judge reached this conclusion after finding that: (1) there was no dome light available in the station wagon; (2) there was no indication whether Ms. Hill "ever had an opportunity to look . . . over the transmission hump, and onto the driver's side where the gun was allegedly, half obscured under the seat"; (3) "[t]he police officer's testimony . . . that he had to come forward and look back into the car, in order to see the

gun";[6] (4) "[t]he defendant ... has not denied that the gun was there," and "[t]he issue [in the case] is whether or not he possessed" the gun, not whether he owned it; and (5) defense counsel delayed in trying to find Ms. Hill, and therefore, "perhaps this witness is not as critical as counsel would have us believe."

We turn now to the applicable legal principles. "The refusal by the prosecution to disclose material evidence favorable to the defense deprives the defendant of his liberty without due process of law." *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citing *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194); *see also Black v. United States,* 755 A.2d 1005, 1010 (D.C. 2000). Thus, "[a] violation of due process under *Brady* occurs when the prosecution fails to disclose, before or during trial, evidence favorable to the defense, *see Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194; *see also Black* [, *supra* ], 755 A.2d [at 1010], and 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Black,* [*supra,* 755 A.2d] at 1010." *Gaither v. United States,* 759 A.2d 655, 662 (D.C.2000). "A reasonable probability of a different result exists when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 662–63 (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) (other citation omitted). Moreover, decisions concerning whether to grant a continuance or a mistrial in the face of an asserted *Brady* violation rest in "the trial judge's sound discretion." *Edelen, supra,* 627 A.2d at 972 (citing *Rambert v. United States,* 602 A.2d 1117, 1120 (D.C.1992)) (other citation omitted).

We conclude, first, that the trial court did not abuse its discretion by denying defense counsel's motion for a continuance or mistrial. White knew, as early as the date of his arrest, July 12, 1995, that there were three persons in the station wagon who were potential witnesses to the events. Moreover, defense counsel was aware, as early as March 27, 1996, prior to the commencement of trial, that a female witness had testified before the grand jury, stating that she did not see a gun in the station wagon. In addition, as the trial court found, once defense counsel received the statement and the name of the witness, he delayed further in attempting to contact Ms. Hill. By the time he made an effort to reach her, she had gone to Virginia. Furthermore, White knew Ms. Pixley, the other female passenger in the car, and the other male in the station wagon, Anthony Day. Nothing in the record summarizes the specific efforts the defense made to contact Ms. Hill through Mr. Day, or Ms. Pixley, other than defense counsel's assertion on April 19, 1996, that Ms. Pixley's telephone was disconnected. Nor does the record reflect any motion to compel disclosure of the grand jury witness' identity or statement after defense counsel received the telephone information from the prosecutor on March 27, 1996. Furthermore, defense counsel did not make an adequate showing as to how the fact that Ms. Hill did not see the gun, would advance White's apparent defense that he neither saw nor placed a weapon in his car *on the evening in question;* his defense did not contain a general denial as to knowledge or placement of the weapon in the station wagon. Under the circumstances, we see no abuse of discretion in the trial court's denial of

---

6. The trial court apparently referenced part of the testimony of Officer Dahl, who viewed the gun from the passenger side of the white station wagon: "I looked [into the white station wagon] and I saw [the gun]. I could see it from the passenger side. If I looked inside the vehicle, looked down in the car I could see the weapon." Officer Dahl looked into the station wagon from the same side on which Ms. Hill was seated. In contrast, Officer Foran saw the gun from the passenger side of the car, and testified that he "observed what appeared to be a [handgun] on the [floorboard] by the driver's seat."

the oral motion for a continuance of mistrial.

 Second, even assuming, without deciding, that Ms. Hill's statement that she did not see the gun in the station wagon is material, White must show that the government's initial withholding of Ms. Hill's statement and name " 'undermines confidence in the outcome of the trial.' " *Kyles, supra,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley, supra,* 473 U.S. at 678, 105 S.Ct. 3375). At the suppression hearing, the trial judge credited the testimony of Officer Foran, who stated, in part, that when he illuminated the interior of the station wagon with his flashlight while standing outside the car, he saw the gun underneath the driver's seat, in plain view, near the spot where White's right thigh would have been positioned. Officer Dahl also testified that he saw the gun in plain view when he "looked down in the car." Furthermore, given the jury's verdict, reasonable jurors also believed that the officers saw the gun in the car. Significantly, there was no defense showing that Ms. Hill was in a position to see the gun while occupying the front passenger seat in the station wagon, without a dome light or illuminated headlights, at 2 a.m. in a remote, unlit area of the police station parking lot. There was also no showing that Ms. Hill's failure to see the gun, even if credited, would undermine the reasonable inference that since the gun was on the floor of the white station wagon at White's right thigh, and White was in the driver's seat, he put it there. Given these circumstances, we cannot say that the government's "nondisclosure [of Ms. Hill's name and grand jury statement] was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

### The Motion for Judgment of Acquittal

 Finally, we are unpersuaded by White's third argument that the trial court erred by denying his motion for judgment of acquittal at the conclusion of the government's evidence. In examining the denial of a motion for judgment of acquittal, we "review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) (citing *United States v. Covington,* 459 A.2d 1067, 1070–71 (D.C.1983)) (other citations omitted). "The motion for judgment of acquittal must be granted if the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." (Emphasis in original). *Id.* (citing *Austin v. United States,* 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 (1967)).

 Our review of the record on appeal shows ample evidence to convict White beyond a reasonable doubt of: (1) carrying a pistol without a license, *see Tucker v. United States,* 421 A.2d 32, 34– 35 (D.C.1980), and D.C.Code § 22–3204(a); (2) possession of an unregistered firearm; *see Fields v. United States,* 698 A.2d 485, 490–91 (D.C.1997), *cert. denied,* 523 U.S. 1012, 118 S.Ct. 1203, 140 L.Ed.2d 331 (1998), and § 6–2311(a); and (3) unlawful possession of ammunition, *see Logan v. United States,* 489 A.2d 485 (D.C.1985), and § 6–2361. Moreover, the fact that White was not seen with gun in hand is not dispositive. The government may show actual or constructive possession of the weapon. Actual possession is defined as, "the ability of an individual to knowingly exercise direct physical custody or control over the [weapon], while constructive possession exists where a person is knowingly in a position or has the right to exercise dominion and control over the [weapon]." *Hack v. United States,* 445 A.2d 634, 639 (D.C.1982) (citation and internal quotations

omitted). "Knowledge of the whereabouts of the [weapon] may be inferred from circumstantial evidence. Dominion or control over [the weapon] is shown when the accused has some appreciable ability to guide its destiny...." *Curry, supra,* 520 A.2d at 263 (citation omitted).

[redacted] In the case before us, the government's evidence established that White not only owned the station wagon, but also was its driver on the night before and the early morning of his arrest. As we have stated previously: "It is usually easy to establish that the owner of a car ... has constructive possession of illicit items recovered from [the car]." *Taylor v. United States,* 662 A.2d 1368, 1373 (D.C.1995). We have also said that: " 'evidence of proximity [is] sufficient to permit the jury to infer convenient access, and [ ] the location of the weapon in plain view [is] sufficient to permit the jury to infer that the appellant knew of its presence.' " *Brown v. United States,* 546 A.2d 390, 398 (D.C.1988) (citation omitted). Based upon the testimony of Officer Foran, and that of Officer Dahl, concerning the position of the loaded revolver in White's station wagon on the floor at his right thigh, reasonable jurors could infer that White had knowledge of the gun, the ability to possess it, and the intent to exercise control over it. Thus, the evidence was sufficient to support a finding that White had at least constructive possession of the weapon. Consequently, we agree with the government that the evidence was sufficient beyond a reasonable doubt to support White's convictions.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*